## WILLIAM SINCLAIR's (dependents') CASE.

Suffolk. November 15, 1923. — April 8, 1924.

Present: RUGG, C.J., BRALEY, DeCOURCY, CROSBY, PIERCE, CARROLL, & WAIT, JJ.

*Workmen's Compensation Act*, Compensation for death, Amount of compensation. *Proximate Cause.*

Upon evidence before the Industrial Accident Board at the hearing of a claim by dependents of a workman who, following an injury and treatment by several physicians, reached a condition of mind which caused him to refrain from food and to die of starvation, it was *held*, that a reasonable man might adopt the opinion of the attending physician and mental expert that, while a psychasthenic case can have ideas that are not properly sane and at the same time not to be considered insane, psychasthenic cases can go over the border line and become insane and " That is what happened in this case, — the psychasthenic case went over the border line and became insanity," and find a causal relation between the injury and death.

It was the purpose of the Legislature in the statutes now appearing in G. L. c. 152, §§ 31, 34, to limit to $4,000 the amount which the insurer may be required to pay for compensation for injury or, should death follow injury after compensation has been paid the injured employee, for injury and death.

In a claim under the workmen's compensation act, it appeared that after his injury the employee died and that previous to his death he had received some payments of compensation for his injury. A single member of the Industrial Accident Board ruled that dependents wholly dependent upon the employee were entitled to receive as compensation

the maximum weekly amount that could be paid to the beneficiaries for a number of weeks which, added to the weeks for which compensation was paid before the death of the employee, would make four hundred weeks. The entire amount which would have been paid on that basis would have exceeded $4,000. On review, the full board decided that the dependents should receive a sum which, added to that which had been paid to the employee previous to his death, would make $4,000. Upon certification to the Superior Court, that court ordered the payment of a sum by weekly payments which would finally amount to $4,000 beyond what the employee had been paid in his lifetime. On appeal by the insurer, it was *held*, that under the provisions of G. L. c. 152, §§ 31, 34, a decree should be entered in accordance with the decision of the full board.

CERTIFICATION, filed in the Superior Court on March 10, 1923, under the provisions of the workmen's compensation act, of a decision of the Industrial Accident Board upon a claim of the dependents of William Sinclair, who, while an employee of the county of Essex, received injuries on January 28, 1922, which resulted in his death on August 10, 1922.

The claim was heard by a single member of the Board on evidence described in the opinion. He found as follows:

" The contention of the insurer that the employee's death was suicidal is not borne out by a careful consideration of all the evidence. The psychosis, or mental disorder which the injury produced as a consequence, affected his health and constitution profoundly, causing acute depression, and inability to hold food. It is found that his powers of resistance were reduced by the increasing effects of the malady, which produced an inhibition that caused a practical destruction of his will power, and no effective power or control of the will remained. The death resulted from the injury without the chain of causation therefrom being broken.

" The widow, Blanche C. Sinclair, and her daughter Marion, aged fifteen, having been wholly dependent upon the deceased for support, are entitled to compensation of $12 a week for a period of three hundred seventy-three and five-sevenths weeks from the date of death, August 10, 1922, which was the date of the last of the compensation payments made during the lifetime of the deceased, there having been paid to the employee up to the time of his death, twenty-six and two-sevenths weeks' compensation at $16 a week; said

weekly award amounting to $4,484.57 as the maximum to the beneficiaries according to the provisions of § 31 of the Act."

On review, the full board affirmed and adopted the findings and decision of the board member except that the board found, " insurer having paid the deceased employee the sum of $420.57 as total incapacity compensation before his death, his widow, Blanche C. Sinclair, is entitled to total compensation of $3,579.43 in weekly payments of $10 dating from the time of the employee's death August 10, 1922, and continuing subject to the provisions of the Act."

In the Superior Court, by order of *McLaughlin*, J., a decree was entered ordering payments to the claimant of the sum of $4,000 in weekly payments of $10, beginning with August 10, 1922, and continuing according to the provisions of the workmen's compensation act.

The insurer appealed.

The case was argued at the bar in November, 1923, before *Rugg*, C.J., *Crosby*, *Pierce*, & *Carroll*, JJ., and was afterwards submitted on briefs to all the Justices.

*G. Gleason*, for the insurer.

*P. N. Jones*, (*C. A. Greene* with him,) for the claimant.

PIERCE, J.   This is an appeal from a decree of the Superior Court affirming a finding of the Industrial Accident Board and ordering that the insurer pay to the dependent the sum of $4,000 " in weekly payments of $10, beginning with the tenth day of August, 1922, and continuing according to the provisions of the workmen's compensation act (G. L. c. 152)."

Two questions are raised.

1. Was there causal relation between the employee's death on August 10, 1922, and his injury of January 28, 1922 ?

2. Did the Superior Court properly allow the dependent $4,000 compensation without deducting therefrom the sum of $420.57 which the insurer had paid the deceased employee before his death?

The findings of the member that the employee received an injury arising out of and in the course of his employment on January 28, 1922, and that the employee's death resulted

from that injury on August 10, 1922, on review were affirmed and adopted by the Industrial Accident Board and must stand if there was any reasonable evidence upon which they could have been made. *Pigeon's Case,* 216 Mass. 51. *Pass's Case,* 232 Mass. 515. *Chisholm's Case,* 238 Mass. 412, 419. *Walker's Case,* 243 Mass. 224, 226. The employee at the time of his death was nearly thirty-nine years of age. When injured on January 28, 1922, he had been employed in the Essex County Court House since March 27, 1920. Under the supervision of an engineer, his duties were to take charge of fires, act as watchman, shovel coal from the cars, fill a small car with coal from the bunker, push that car to the front of the boilers and shovel the coal into the boiler. While pushing a coal car on January 28, 1922, he felt something strain in his dorsal spine, heard something snap; he came home and could not do anything more for the rest of the day. He never did any more work and was paid compensation for total incapacity until his death on August 10, 1922. Two or three days after the accident, as his back was much worse, the employee consulted a physician who referred him to an osteopath. This doctor treated him for a month without his getting any relief. On February 17, 1922, he gave up the osteopathic treatment and at the suggestion of the insurer went to the insurer's doctor. From that time he did not treat with any other doctor except Dr. McDermott and the company's doctor, Dolan. He was given electric treatment twice a week for a time and grew worse; he was then fitted for a brace, which he could not wear because it hurt him, and then to another, which he gave up because it did not support his back.

His wife testified, in substance, that " She noticed his condition getting worse all the time. He worried all the time and said he could not get any encouragement from anybody that he would ever be any better; that his back pained him; he did not have any courage."

His attending physician, a specialist in nervous and mental work, testified in substance that he learned in the examination of the employee that one of the physicians had told

him that he could not do anything for him; that the person who made the brace told him that he did not think it would do any good; and that the osteopath told him that he had a bone out of place and would have to be careful of that to see that it did not slip over and he would have to have quite a few treatments to have that stay in place. He further testified that he found the employee in bed complaining of a great deal of pain in through his back and down through his groin, extremely apprehensive and afraid to walk around at all; that in his opinion the entire situation was due to the mental attitude the employee had assumed in regard to his condition; that he told him that his condition was one that could be cured; that the employee did not take any stock in what he said and told the witness not to come again; that after three weeks he was sent for and he told the employee it was foolish for him to go along in that way, that his entire condition was due to the mental attitude he was assuming in regard to his condition, that he should make up his mind he could improve his condition, and if he would begin moving around and taking an interest in affairs he would find he would get "entirely better;" that the witness "found the reason he would not move around was because he was afraid he was going to dislocate his spine and be a chronic invalid." He further testified that the employee "continued in the same mental attitude with the added difficulty that he began to feel he was an encumbrance on his family;" that he was never going to be of any use; that he was going to be a chronic invalid and he said life was not worth living; that he began cutting down on his nourishment and would not eat; that the "witness felt with the situation underneath here that he was going to starve himself to death, so witness threatened him with forced feeding and that they would send him to an institution;" that every time he threatened him he would begin to improve, "but gradually he failed right down and died practically from starvation due to this acute depression and the psychasthenic state he had from the ideas he had gotten into his mind."

The witness further testified in substance that what

brought about his mental condition was worry over what was going to happen to him from the accident; that the accident in itself was not a thing to cause acute depression but he (the employee) had gotten the idea in his mind that he was going to be an invalid and if he moved a certain way he was going to become paralyzed and the bones were going to jump over and paralyze him; and that fear of the future of being a chronic invalid was what caused the acute depression; that in July the mental attitude of the employee had progressed to the point where he was starving himself; that the witness felt that the employee had a realization of what he was doing at that time, and thought that the acute depression had prevented the employee from having any appetite or desire for food; that at the end of it the employee " simply and deliberately intended to finish the work "; that he " was conscious in his own mind of what he was doing "; that he was doing it deliberately; that he was not unconscious until a day or two before he died and until the last day or two he was conscious of what was going on to a great extent.

The wife of the employee testified that her husband expressed the opinion that he was not going to get well, that life was not worth living after he thought there was no help; that from the last of March he did not think there was any help for him; that he knew there never could be anything done for him, and he did not want to live if he could not get better; that he never could get better and that after March he said he would like to get better if he thought he could but knew he could not.

The physician further testified, in substance, that worry over the accident and worry over what was going to happen to him from the accident brought on his mental condition; that there is a fine distinction between fear and worry; that in this case it was fear of what was going to happen to him, the fear of being an invalid, and the worrying over all the circumstances and what was going to happen to his wife; that the first time he saw the employee he was unable to convince him at all that there was any hope for him; that in point of fact there was a great deal of hope for him if the

witness could have convinced him that that was so; that the fear of being a chronic invalid was the cause of the depression of the employee; that psychasthenia was a separate condition and it was probably the cause of the acute depression; that psychasthenia is the ideas that come into a person's mind producing nervous symptoms; that psychasthenia is entirely mental and produces nervous symptoms through the ideas that are going on, and that produces acute depression; and that the employee starved as the result of the worry and psychasthenia and acute depression.

Upon the reported evidence a reasonable man might adopt the opinion of the attending physician and mental expert that, while a psychasthenic case can have ideas that are not properly sane and at the same time not to be considered insane, psychasthenic cases can go over the border line and become insane and "That is what happened in this case,— the psychasthenic case went over the border line and became insanity," and find a causal relation between the injury and death. On the facts, the case at bar is distinguishable from *Daniels* v. *New York, New Haven & Hartford Railroad*, 183 Mass. 393, and *Sponatski's Case*, 220 Mass. 526.

We are of opinion the allowance of $4,000 to the dependent without deduction of the amount paid the employee before his death was error. A careful reading of the statutes of 1911, c. 751, Part II, §§ 6, 9, as amended by St. 1914, c. 708, §§ 2, 4 (now G. L. c. 152, §§ 31, 34), makes plain the purpose of the Legislature to limit the amount to $4,000 which the insurer may be required to pay for compensation for injury or for injury and death should death follow injury after compensation has been paid the injured employee. And it is plain the statute under which the present dependent claims compensation after the death of the employee should be construed in furtherance of such intent, and not in a way which shall permit in possible conditions a decree ordering the insurer to pay the dependent a sum of money which, with compensation paid to a deceased employee, shall exceed $4,000.

The decree of the Superior Court must be modified so that the order shall be to pay the claimant widow $3,579.43 in weekly payments of $10, subject to the provisions of the compensation act, G. L. c. 152. It results, in the opinion of a majority of the court, that the decree as modified should be affirmed.

*Decree accordingly.*