FRANK TETRAULT's (dependent's) CASE.

Suffolk.    November 10, 1931. — March 15, 1932.

Present: RUGG, C.J., PIERCE, WAIT, SANDERSON, & FIELD, JJ.

*Workmen's Compensation Act*, Injuries to which act applies.    *Suicide.*

Evidence, at a hearing in proceedings under the workmen's compensation act, warranted findings that an injury suffered by the employee resulted in insanity and that the employee committed suicide while insane, but did not warrant a finding that the suicide resulted from an uncontrollable impulse or a delirium of frenzy without conscious volition on his part to produce death; and a conclusion by the Industrial Accident Board, that the injury was the proximate cause of the employee's death, and an award of compensation to his widow, were not justified.

CERTIFICATION to the Superior Court under the provisions of the workmen's compensation act of a decision by the Industrial Accident Board awarding compensation.

Material evidence and findings by the Industrial Accident Board are stated in the opinion.    In the Superior Court, a decree was entered by order of *F. T. Hammond,* J., dismissing the claim.    The claimant appealed.

*O. O. Lamontagne,* for the claimant, submitted a brief.

*G. Gleason,* for the insurer.

FIELD, J.    This is a workmen's compensation case.    G. L. c. 152.    The employee received an injury on December 30, 1929, and was paid compensation until his death.    He died on January 20, 1930, and his widow claimed compensation for his death.    The Industrial Accident Board found that the employee met his death by jumping from a bridge into the Connecticut River, that his death "was causally connected with conditions due to his injury," and awarded compensation.    The Superior Court, however, entered a decree whereby it ruled that the evidence did not warrant a finding that the employee's death was "causally related to any injury arising in and out of the course of his employment," and dismissed the claim.    The claimant appealed.

The burden rested upon the claimant of showing that the employee's death resulted from his injury and not from an

independent intervening cause. *Panagotopulos's Case*, 276 Mass. 600, 605. The evidence warranted findings that the employee committed suicide, that he was then insane, and that the insanity resulted from the injury. Such findings, however, are not sufficient to establish the essential fact that the suicidal act was not an independent intervening cause of the employee's death. The applicable rule is stated in *Sponatski's Case*, 220 Mass. 526, 530: "where there follows as the direct result of a physical injury an insanity of such violence as to cause the victim to take his own life through an uncontrollable impulse or in a delirium of frenzy 'without conscious volition to produce death, having knowledge of the physical nature and consequences of the act,' then there is a direct and unbroken causal connection between the physical injury and the death. But where the resulting insanity is such as to cause suicide through a voluntary wilful choice determined by a moderately intelligent mental power which knows the purpose and the physical effect of the suicidal act even though choice is dominated and ruled by a disordered mind, then there is a new and independent agency which breaks the chain of causation arising from the injury." See also *Daniels v. New York, New Haven & Hartford Railroad*, 183 Mass. 393, and cases cited.

The evidence does not meet the requirements of this rule.

There was testimony that the employee became mentally depressed soon after he was injured and that this condition continued until his death, and also testimony that three days before his death when his stepchild was to be operated on he paid no attention to what was going on.

The employee's wife testified that on Sunday, the day before he committed suicide, "about nine o'clock he started to walk again and she started to notice he was starting to change in his mind . . . he started to become troubled — she meant he was becoming crazy. He said to pray for the damned and started to make the sign of the cross and pray and he reached his finger up in the air. He was saying that and walking in the house and then didn't talk much afterwards; he was walking, he was too nervous and couldn't

remain sitting down . . . Sunday night he sat down and got nervous and started to cry and she asked him if she could do anything for him and he didn't answer; he said he had something to tell her and he didn't want to tell her. He was sitting down and then he would throw his hand up and grab his head; when he was sitting down he was nervous and would holler and grab his head. That continued about an hour on Sunday night . . . . During the time he was ill he complained of headaches all the time. He would grab his head and his head would fall as though it was dizzy and cold; he did that practically every day."

On Monday, January 20, the employee went to the office of his physician. The physician testified that the employee "seemed to be in a very excited state." He "took employee back home because he didn't want to let employee be subject to exposure because he would have to walk back from witness' office to his home about a quarter of an hour. . . . That day employee was very restless, paced back and forth in the office and when witness went out to get his car employee called witness' wife and wanted to know where he was gone and witness had only left a few minutes to get his car out of the garage; employee seemed to be very impatient. Employee failed to react very well and witness told his wife to keep him in the air to try to help his general condition and witness told employee to report to the shop nurse when he could and witness told his wife to have some one go with him. . . . Witness saw him that day about 1:30 and he was in the office about twenty minutes; he seemed to be very depressed; he was unhappy and complained he was worried over a few things, worried over his financial condition; he was afraid he would never pull out of the hole; he was worried about his job, afraid he would lose his job." The witness testified that the employee said, "'Well I guess I will go over and see the old folks on the neighboring street and I will be in to see you the next day' and witness said all right and to come in the next day," and testified further that the last time he saw the employee "he wasn't entirely of sound mind; he was abnormal in his reasoning and in his appearance; his emotion wasn't normal."

A police officer testified that about three o'clock in the afternoon he saw a man, identified as the employee, jump from the bridge. This witness "was driving along by the bridge and he saw this man climb over the rail and he stopped his car and walked back but he jumped before witness could grab him . . . there is a railing and the foot places extend from the sidewalk three or four inches outside the railing; witness saw this man climb over the railing with his foot on the boards facing the water and one hand behind him holding him up . . . it was no place for a man to climb and then witness saw him attempt to jump and then hold back and he made two attempts before witness reached him and that made witness realize he was going to jump. Witness was on the sidewalk when deceased jumped. Deceased said 'good-bye' when he jumped over."

The testimony above recited and the other evidence in the case, though tending to show that the employee's mind was disordered when he committed suicide, did not warrant a finding that he took his own life "through an uncontrollable impulse or in a delirium of frenzy 'without conscious volition to produce death, having knowledge of the physical nature and consequences of the act.'" *Sponatski's Case*, 220 Mass. 526, 530.

*Decree affirmed.*