## Pio Ruschetti's (dependents') Case.

Suffolk. October 8, 1937. — February 8, 1938.

Present: Rugg, C.J., Field, Donahue, Lummus, & Qua, JJ.

*Evidence,* Opinion: expert; Presumptions and burden of proof. *Workmen's Compensation Act,* Injuries to which act applies. *Proximate Cause. Suicide.*

An opinion of an expert witness, qualified as a neurologist and psychiatrist, that suicide of an employee, following injuries within the provisions of the workmen's compensation act, was "an act of unconscious volition" of an insane man resulting from an "uncontrollable impulse," appeared by the record on an appeal from a decree dismissing a claim by the employee's widow to be a mere conjecture in the form of a conclusion from basic facts that in themselves left conjectural the question, whether the death was caused by the injury or by the voluntary though insane choice of the employee; and without other evidence it was proper to rule that the burden on the claimant of establishing that the death was causally related to the injury was not sustained.

Certification of a decision of the Industrial Accident Board to the Superior Court under the workmen's compensation act.

From the record it appeared that before the single member of the Industrial Accident Board the insurer offered no

evidence except testimony by a single expert; and that the single member gave rulings, requested by the insurer, in substance that the burden was upon the claimant to show that the employee's "death resulted from his injury and not from an independent intervening cause"; that there was "a presumption that the employee was sane"; that evidence "that the employee committed suicide, that he was insane and that the insanity resulted from the injury" was "not sufficient to entitle the claimant to a finding"; and that the burden was upon the claimant "of establishing every essential element of her case." The single member, however, refused other rulings, requested by the insurer, in substance that the claimant had "not sustained the burden . . . of establishing the fact that as direct result of his injury the deceased became insane to such a degree of violence as to cause him to take his own life through an uncontrollable impulse or in a delirium of frenzy without conscious volition to produce death"; or "that the deceased did not commit suicide through voluntary wilful choice"; or "that the deceased did not know the purpose and physical effect of his suicidal act"; or "that the deceased did not choose intentionally to commit suicide."

The reviewing board "upon all the evidence" affirmed and adopted "the findings and decision of the single member," affirmed "the specific findings and rulings made by the single member upon the insurer's request therefor," and awarded compensation and costs.

After hearing by *F. T. Hammond,* J., a decree was entered by his order "that the claimant has failed to sustain the burden of proving that the death of the employee . . . was causally related to the injury he sustained on or about April 23, 1935, while in the employment of the subscriber," and the claim was dismissed. The claimant appealed.

*S. B. Horovitz,* (*John S. Stone* with him,) for the claimant.
*M. J. Aldrich,* for the insurer.

LUMMUS, J. The employee received "a personal injury arising out of and in the course of his employment" on April 23, 1935, when his right hand and forearm were badly burned when drawn and caught between a brass roll and a hot cylin-

der. While he was receiving compensation for the injury, on November 2, 1935, he committed suicide. The question is, whether there was evidence to warrant the finding of the Industrial Accident Board that death resulted from the injury (G. L. [Ter. Ed.] c. 152, § 31) so as to entitle his dependents to compensation. *Wnukowski's Case*, 296 Mass. 63. The Superior Court ruled that there was not, and the claimant, who was the widow, appealed.

The law governing the permissibility of a conclusion that death by suicide had its cause in an earlier personal injury, is found in *Daniels* v. *New York, New Haven & Hartford Railroad*, 183 Mass. 393, *Sponatski's Case*, 220 Mass. 526, *Sinclair's Case*, 248 Mass. 414, and *Tetrault's Case*, 278 Mass. 447. In substance, a distinction is drawn between the act of a man, insane as a result of an injury, who nevertheless consciously determines to take his own life and carries his design into execution, in which case the chain of causation between the injury and the death is broken by the voluntary though insane choice of the injured person to die; and, on the other hand, the suicidal act of such a man while in a moment of delirium or frenzy or while under an uncontrollable impulse, "without conscious volition to produce death, having knowledge of the physical nature and consequences of the act," in which case the injury that produced his mental condition is also the cause of his death. But see now St. 1937, c. 370, § 2 (G. L. [Ter. Ed.] c. 152, § 26A).

The employee was a man of middle age, with a wife and five children, some of whom were adults. He was a capable and intelligent workman, vigorous, industrious, cheerful, and of good disposition and character. He lived on a small farm, which he operated besides working in the mill. Some weeks after the accident his arm was amputated, but he came home from the hospital on June 7, 1935, cheerful, and hopeful of getting back to work. But late in July he became discouraged; his arm did not heal properly, pus was present, and he was in great pain. His face became haggard, drawn and worried. He was restless and disinclined to talk. He declared that he could not sleep, and could hardly stand the pain. On one occasion he seized the stump of his arm and

said, "Sometimes I think it is just about driving me crazy. . . . I'm afraid to stay in myself for fear of what I will do." The last two weeks of his life he talked about nothing but his pain, which he described as terrible. He often jumped up suddenly, and seized the stump of his arm, rubbing it. His face would flush, and then he would grow pale, tremble, and perspire. He asked whether people talked about his going insane. He could not sit still, and kept walking back and forth.

On the morning of his death, the employee got up, lighted the fire, and put water on the stove for coffee. After breakfast, carrying a pail of garbage for the pigs, he followed his wife and son to the barn where they had gone to do some chores. After feeding the pigs, the employee stood staring at his wife as she was milking. The son dropped a little hay while feeding the horses, and the employee told him to pick it up. The son started to harness the horses in order to fetch water from a neighbor's spring for the livestock, when the employee instructed him not to do so, because it had started to rain hard and it would not be necessary to get water. The wife and the son then went back to the house, leaving the employee in the barn. The son asked his mother for leave to go to "look at his traps" which were a quarter of a mile away, and she told him to ask his father. The son went to the barn and asked him. The employee answered "All right," and told the son to come back right away. The son went away, but returned to the barn in about fifteen minutes. He found the employee hanging dead from one of the steps of the silo by a rope which was used to tie calves. All that the employee had to do to hang himself in this way, was to adjust a noose around his neck, walk up the steps, tie the rope to an upper step, and then walk off the step upon which he was standing.

Upon these facts a physician called by the claimant, after qualifying as a neurologist and psychiatrist, testified that in his opinion the employee was insane. He testified also that in his opinion the suicide was "an act of unconscious volition," resulting from an "uncontrollable impulse" of an insane man, without "conscious volition to produce

death," although the employee knew that death would result. He stated, however, no tangible reasons for this opinion. On the other hand, an expert witness called by the insurer testified that in his opinion, although the employee suffered from a neurosis which caused him to worry about going insane, he was not insane.

The burden was on the claimant to prove that the injury was the cause of the death, within the rule laid down in the cases cited. *Sponatski's Case*, 220 Mass. 526, 527, 528. *Tetrault's Case*, 278 Mass. 447, 448. The acts of the employee on the day of his death, up to the time when he was left alone in the barn, evidenced considerable reasoning powers. Nothing suggestive of frenzy or utter want of self control appears, beyond the mere fact of suicide. The manner of suicide involved some thought. The act was quite unlike the simple one of strangling one's self with a napkin, as in the *Daniels* case, or jumping from a high place, as in the two cases last cited. Without the expert testimony, a tribunal could find that the injury was the cause of the death only by guess or conjecture rather than by a preponderance of the evidence. The decisive question is, whether the addition of the expert testimony afforded a sufficient basis for such a finding.

Often the function of expert testimony is to interpret subsidiary facts and circumstances by drawing conclusions from them that would be impossible for one having only common knowledge without special or technical qualifications. See, for example, *Jackson* v. *Anthony*, 282 Mass. 540, 543–544, and *Mangano* v. *Marston*, 298 Mass. 133. The conclusion need not be certain; if it is probably true it may have evidential force. *DeFilippo's Case*, 284 Mass. 531, 534, 535. *Sheppard's Case*, 287 Mass. 459, 463. But even though the conclusions of expert witnesses have been admitted in evidence, there are limits to the evidential force of such conclusions when the question arises whether the tribunal of fact is warranted in finding in accordance with them. In the first place, the opinion even of one who has qualified as an expert can be given no weight as evidence but must be disregarded when the opinion is contrary to

common sense or to known natural laws of which the court can take judicial notice. *Neiss* v. *Burwen*, 287 Mass. 82, 90. *Cochran's Administrators* v. *Chesapeake & Ohio Railway*, 232 Ky. 107, 110. *United States* v. *Hill*, 62 Fed. (2d) 1022, 1025. *Ocean Accident & Guarantee Corp. Ltd.* v. *Moore*, 85 Fed. (2d) 369, 375. Compare *State* v. *Knight*, 43 Maine, 11, 133, 134; *Post* v. *United States*, 135 Fed. 1, 11; Wigmore, Evidence (2d ed.) §§ 659, 662, 663. Expert opinion that a common device is dangerous and improper has no weight when common knowledge shows the contrary. *Pastrick* v. *S. S. Kresge Co.* 288 Mass. 194. See also *Blanchard's Case*, 277 Mass. 413, 415; *Miller* v. *United States*, 71 Fed. (2d) 361; *United States* v. *Spaulding*, 293 U. S. 498, 506.

A mere guess or conjecture by an expert witness in the form of a conclusion from basic facts that do not tend towards that conclusion any more than towards a contrary one, has been held to have no evidential value. *Blanchard's Case*, 277 Mass. 413, 415. *Kramer* v. *New York Life Ins. Co.* 293 Mass. 440, 445, 446. *Spear* v. *Hiles*, 67 Wis. 361, 367. *Bucher* v. *Wisconsin Central Railway*, 139 Wis. 597, 606, 607. *United States* v. *Hill*, 62 Fed. (2d) 1022, 1025, 1026. *United States* v. *Owen*, 71 Fed. (2d) 360. In *Dreher* v. *Order of United Commercial Travelers*, 173 Wis. 173, 178–179, the only evidence of death by external violence was a reddish spot on the skin over the temple and the testimony of a physician that because of the existence of that spot he was of opinion that death was caused by a blow on the temple. The court said, "The opinion of the physician as to the cause of death is invoked to supply the substantive facts necessary to support his conclusion. This cannot be done. It is the function of opinion evidence to assist the jury in arriving at a correct conclusion upon a given state of facts. To endow opinion evidence with probative value it must be based on facts proven or assumed, sufficient to enable the expert to form an intelligent opinion. . . . [The physician] may be credited with the expression of his honest opinion concerning the cause of the death of the deceased. His opinion in that respect, however, could be nothing more

than mere intuition or conjecture." We think that the opinion of the physician called by the claimant in this case was of the same sort, and did not warrant the finding of the board.

*Decree affirmed.*