LOREN C. NASS *vs.* TOWN OF DUXBURY.

Plymouth. March 7, 1951. — May 10, 1951.

Present: QUA, C. J., LUMMUS, SPALDING, & COUNIHAN, JJ.

*Proximate Cause. Nuisance. Water. Evidence*, Opinion: expert.

Evidence did not warrant a finding that periodic dumping of sand on a town beach situated on the south side of a tidal estuary opposite a natural mound or bar in the middle of the estuary was the proximate cause of a filling in of the channel between the beach and the mound and consequent deflection of the current injuring land on the north side of the estuary.

Opinion testimony by an expert witness that periodic dumping of sand on a beach situated on an estuary changed the channel and current of the estuary did not rest on sufficient basic facts to make it more than a mere conjecture, and had no probative value.

TORT. Writ in the Superior Court dated December 3, 1947.

The action was tried before *Smith, J.*

*E. A. Egan*, (*J. J. Geogan* with him,) for the defendant.

*A. L. Lewis*, (*D. S. Smith* with him,) for the plaintiff.

SPALDING, J. By this action of tort the plaintiff seeks to recover for injury to his land allegedly caused by the defendant's deflection of the current of a natural watercourse in such a manner as to scour out and carry away a portion of his land. The declaration originally contained two counts, but one was waived, and the case went to the jury on a count alleging the maintenance of a nuisance. There was a verdict for the plaintiff, which was taken under leave reserved, and the case is here on the defendant's exceptions to the denial of its motion for a directed verdict, to the

denial of its motion to enter a verdict under leave reserved, and to the admission of certain evidence.

A summary of the evidence most favorable to the plaintiff is as follows: The plaintiff and the defendant are riparian owners on opposite sides of the Blue Fish River, a tidal estuary emptying into Duxbury Bay. Both properties are bounded on the westerly side by Washington Street, and extend easterly from that street, the plaintiff's property for a distance of some one hundred fifteen feet, and the defendant's property for a somewhat greater distance. The channel of the river, so called, which has its origin in two ponds lying approximately one quarter of a mile to the west of Washington Street, proceeds through a culvert under that street, thence easterly between and past the two properties for a distance of approximately eight hundred feet at which point it turns northward, and then again turns in an easterly direction to empty into Duxbury Bay at a point some sixteen hundred feet east of the culvert. It is agreed that the boundary line between the properties, that is, the southerly boundary of the plaintiff's property and the northerly boundary of the defendant's property, is the middle of the river's channel, extending approximately due east from the center line of the culvert.

On a portion of the town's property is a public bathing beach which may be used only at high tide. Its origin is lost in antiquity but it is reputed to have existed since the Pilgrim days. From pictures and plans which are before us the most westerly end of the beach is opposite the easterly portion or rear of the plaintiff's property. It is undisputed that the distance from the southerly end or rear of the beach to the center of the channel is approximately one hundred eighty feet. The beach extends northerly in the direction of the channel a distance of seventy feet.

The plaintiff purchased his property in 1932. It was reclaimed marshland and admittedly "gougy." There was no retaining wall built up from the bed of the river although there were the remains of piles which formed structural support for a wharf which once existed there. When the

tides were affected by hurricanes or northeast storms, the water rose to within a foot of the plaintiff's lawn. The normal tide in the estuary was variously described as being between ten and eleven feet.

As one proceeds easterly from the culvert he would encounter, at low tide, a basin, variously referred to as a well or pond of stagnant water. In the middle of the channel bed at some point beyond the easterly boundary of the plaintiff's property and opposite the town's beach is a mound or bar visible above the water at low tide. It is a foot or two in height at its highest point. According to the testimony of one of the plaintiff's witnesses the edge of the mound was ten feet from the nearest part of the defendant's beach. The plaintiff's wife, however, testified that there were fifty feet of channel river bottom between the most southerly or lowest part of the mound and the nearest part of the town's beach. It is not clear whether these witnesses were referring to the southerly water line at high tide or at low tide or at different tides. The mound was composed of mud, sand, gravel, stone, clam shells, and mussel shells; it was a natural accretion which might well have been forming for the last forty or fifty years. Beyond the easterly part of the bar the river bottom was practically dry at low tide, and between the beach and the mound it consisted of "mud, muck and just river bottom." The same conditions existed on the north side of the mound. For several hundred feet both above and below the beach the bottom consisted of muck, sand, gravel, and shells.

When the plaintiff purchased his property in 1932 the current of the ebbing tide passed from the culvert in a straight line down the middle of the stream past the plaintiff's property until the tide became so low that the mound or bar was exposed, at which time the current passed through the channels on either side of the mound. When the tide commenced to ebb, water poured through the culvert at the rate of two hundred twenty cubic feet per second with its strongest current one half hour before and one half hour after mean tide. The culvert is twenty feet

wide, about fourteen or fifteen feet high, and about sixty feet long, and extends out beyond each side of the forty foot street surface.

It appears that long before 1934 and thereafter the beach had been annually refilled with sand. The amount used each year for this purpose was from eight to ten cubic yards. There is no evidence as to where on the beach this sand may have been placed and no evidence that any of it was dumped in the channel south of the mound. In 1934 or 1935 some two hundred cubic yards of sand were dumped over a portion of the beach and when spread over the "entire beach" covered it to a depth of from one quarter to one half an inch. It does not appear whether this reference to the entire beach means the beach area as it was constituted at full high tide or whether it means the entire slope of the defendant's land when the tide was out.

A year or two after 1934 or 1935 the channel south of the natural mound filled in, and the channel on the north side of the river increased in width, becoming deeper and larger. The force of the water in the north channel increased because there was now only one channel to take care of the average ten foot tide. The current proceeded downstream past the plaintiff's land until it reached the natural mound opposite the defendant's beach and then, because the south channel had been blocked, swirled back into the well or basin below Washington Street, undermining the plaintiff's bank. It is apparent that this scouring action occurred at almost low tide because the testimony for the plaintiff indicates that at high tide the strongest part of the current passed straight through the culvert and on over the natural mound.

In 1947 the whole channel below the culvert, including the natural mound, was dredged out, and no further damage has since occurred to the plaintiff's property because the force of the current runs in a straight line down the middle of the channel and no longer approaches the north bank. By that time some fifteen or twenty feet of the plaintiff's land had been undermined and carried off despite his con-

tinual filling in of the bank with gravel and stone in the more recent years.  This damage occurred between 1940 and 1947. During this period the plaintiff's south bank has "slowly disintegrated from the force of the tide and its encircling movement."

To prove the causal relationship between the sand placed on the defendant's beach and the damage to his own property, the plaintiff called an expert witness whose qualifications were unchallenged.  This witness testified that he had first viewed the property in 1946, and that up to the date of the trial he had viewed it from six to ten times.  At a stage in the trial when the only evidence as to the quantity of sand dumped was that there had been from six to eight truck loads of undisclosed sizes in 1940 and every couple of years thereafter, he was asked, "Assuming . . . that the jury finds as a fact that loads of sand were dumped on that beach periodically that is, every Spring from 1935 to 1946 or '47, would that sand change the channel of the river or change the current of the river?"  There was no objection to the question, which was answered in the affirmative.  He also testified that the sand would be carried down from the sloped surface on mud by the effect of tidal water and rain at low tide in such a manner as to fill up the channel south of the mound on the defendant's land and deflect the water northward.  When the channel had been dredged in 1947 he had seen some sand and mud which he asserted had washed off the beach.

On the foregoing evidence we are of opinion that the case ought not to have gone to the jury.  It was incumbent on the plaintiff to show that there was a greater likelihood that the injury to his land was caused by a nuisance maintained by the defendant than from some cause for which it was not liable.  *Rocha* v. *Alber,* 302 Mass. 155, 157–158. *Galbraith* v. *Levin,* 323 Mass. 255, 261.  Such causal connection was not shown here.  Apart from the testimony of the plaintiff's expert the evidence showed only that a year or two after 1935 the south channel began to fill up and ultimately was filled, thereby causing the water to take

a different course. But that this filled up because of anything done by the defendant was not established beyond conjecture. According to the defendant's answers to interrogatories propounded by the plaintiff the defendant had been putting sand on the beach for "many years." This was not contradicted and was binding on the plaintiff. *Gordon* v. *Bedard*, 265 Mass. 408, 411. A jury, on such evidence, would not be warranted in finding that the acts of the defendant caused the damage complained of. For aught that appears the filling in of the channel could just as well have been due to other causes for which the defendant was not responsible.

It remains to consider whether the testimony of the expert was sufficient to tip the scales in the plaintiff's favor. We think it was not. "A mere guess or conjecture by an expert witness in the form of a conclusion from basic facts that do not tend towards that conclusion any more than towards a contrary one," has no evidential value. *Ruschetti's Case*, 299 Mass. 426, 431, and cases cited. *Callaghan* v. *R. H. White Co.* 303 Mass. 413, 416. *Brownhill* v. *Kivlin*, 317 Mass. 168, 170. See *Friese* v. *Boston Consolidated Gas Co.* 324 Mass. 623, 627. There was no evidence as to the quantity of the beach sand, as distinct from sand and mud from other sources, which found its way into the south channel. From both the direct and cross-examination of the expert it appeared that he was unable to state the proportion of beach sand to the mud which naturally existed there, and there was no evidence in the case bearing on that question. He had no knowledge of the depth of the sand and mud. It was an "unidentifiable mixture of sand and mud, and you can't tell which is which." He did not know the dimensions of the sand bar which had allegedly formed between the natural mound and the defendant's beach. He made no measurements of the length or width of the beach or of the depth of sand thereon, and he did not know how much sand had been placed on the beach or when it might have been placed. His opinion

was given without reference to any particular amount of sand that might have been placed on the beach. Except for the previously summarized evidence in regard to the quantities of sand dumped and the seventy foot north-south dimension of the beach, no evidence on these crucial issues ever got into the case. There was no evidence that the sand allegedly in the channel was of the same texture or composition as that on the defendant's beach. "It is the function of opinion evidence to assist the jury in arriving at a correct conclusion upon a given state of facts. To endow opinion evidence with probative value it must be based on facts proven or assumed, sufficient to enable the expert to form an intelligent opinion." *Ruschetti's Case,* 299 Mass. 426, 431. The basis for such an opinion, we think, was lacking here.

· Since the defendant's exception to the denial of its motion for a directed verdict must be sustained, we do not reach the other questions argued by the defendant.

*Exceptions sustained.*

*Judgment for the defendant.*