PHILIP J. OBERLANDER'S (dependent's) CASE.

Suffolk. April 6, 1964. — July 7, 1964.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, & REARDON, JJ.

*Workmen's Compensation Act,* Injuries to which act applies. *Proximate Cause. Evidence,* Opinion: expert.

A dependent of an employee seeking compensation for his death under the Workmen's Compensation Act on the ground that his employment was the proximate cause of a mental condition leading to his suicide had the burden of so proving by expert medical testimony. [5]

A finding in a workmen's compensation case that there was a causal connection between work of the employee of a kind disliked by him and a depressed mental condition culminating in his suicide was not warranted by testimony of a psychiatrist which, although it included his opinion that such causal connection was a "probability," showed that the opinion actually rested on mere possibilities. [7]

CERTIFICATION to the Superior Court of a decision by the Industrial Accident Board under the Workmen's Compensation Act.

The case was heard by *Beaudreau,* J.

*Avram G. Hammer* (*Richard C. Sheppard* with him) for the claimant.

*Thomas A. L'Esperance, Jr.,* for the insurer.

SPALDING, J. On January 31, 1954, Philip J. Oberlander (employee) committed suicide. His widow (claimant) brings this claim for compensation alleging that her husband's suicide resulted from a personal injury arising out of and in the course of his employment.

We summarize the pertinent evidence. The employee at the time of his death was sixty-three years old. For twenty-one years prior to his death he had been employed as a glazier by Wilbur H. Burnham (employer) who was engaged in the business of designing, making, and installing stained glass windows. Most of the employee's work was performed at his employer's studio in Boston. He also did work as an "outside man" installing windows. In the performance of these duties he was required to work on a scaffold, and frequently he was obliged to make trips out of town. His duties on these trips also required him to act as supervisor and to hire workmen at the local union headquarters.

In 1943, while at work on a cathedral in Washington, he severed a tendon of one of his fingers which resulted in total incapacity for nine and one-half weeks. Thereafter he returned to work.

During the two years preceding his death the employee developed a dislike for out of town work. He disliked especially working on the scaffolding and the hiring and supervising of other workmen. When apprised of an impending trip, he became uncommunicative and despondent. About two weeks prior to January 8, 1954, he learned that he would have to do some work on the National Cathedral in Washington. On January 8 the employee appeared to be very troubled and "worried to death"; he had no interest in eating and would not talk. Finally, he said to his wife, "We are licked, I can't make that trip, my job is done." There were several telephone conversations in which the employee and his wife informed the employer that the employee would not do outside work any more. In one of these conversations the employer told the employee that he was "fired." Shortly thereafter, the employer left a message

with a member of the employee's family suggesting that the employee discuss with him the possibility of returning to work. The employee never acted upon the suggestion and never returned to work. For the next three weeks the employee was very troubled. He would not enter into conversations or respond to questions; he was not interested in eating, reading or watching television. On January 31, at about 2 A.M. (a Sunday) he seemed very disturbed and said that on Monday he would have to go to a union meeting or "they were going to kill him." He then uttered the "worst" scream that his wife had ever heard. After that he quieted down, and his wife went back to sleep. Later that morning his body was found downstairs. The cause of death was asphyxiation by hanging.

Dr. Gardner, a psychiatrist called by the claimant and who had never seen the employee, testified in response to a hypothetical question that "there was a relationship between . . . [the deceased's] employment and his death." He based this opinion "on one or two possibilities, both of which had some effect." One of these possibilities was that the employee's injury to his hand in 1943 might have caused a neurosis and fear of injury. As time went on he became unsteadier and more apprehensive when he went on the scaffolding and he was "torn between fear of injury and fear of becoming unemployed." The final blow was the loss of his job. This precipitated "a severe real depression" and this "depressive reaction . . . culminated in his unfortunate death." Another possibility was that the employee, approximately two years before his death, "developed a male climacteric, a depressive reaction which occurs in some men with what . . . [is called] a change of life." One in this condition develops "exceedingly strong morbid feelings" which would be aggravated by the fear of outside work. The loss of his job "led to his feeling that he was completely lost and hopeless." When asked whether the relationship between employment and death was a "possibility" or a "probability," Dr. Gardner answered, "I would state 'probability' if you are giving me choice of words."

A report of Dr. Stoller, a general practitioner, was introduced in evidence which disclosed that the employee had been under his care from April 14, 1953, to January 23, 1954. Dr. Stoller treated the employee for mental depression, insomnia, and gastritis. These conditions, according to the report, were brought on by fear of out of town assignments where he would have to work on scaffolding, and fear of the loss of his job if he refused such assignments.

Dr. Kozol, a psychiatrist called by the insurer, testified that the cause of the employee's suicide was a "depressive psychosis of late middle life," and that "[t]here was no connection between his employment and the mental illness . . . which caused his death."

The single member in a decision denying compensation made findings of fact and concluded that the "claimant has failed to prove that the employee sustained a personal injury which arose out of and in the course of his employment and that therefore there is no causal relationship between his death . . . and any personal injury he may have received while . . . [working for his employer]."

The reviewing board in a decision rendered by two of its members made findings of its own and reversed the decision of the single member. The board stated that it "adopt[s] the opinion of Dr. Gardner as its opinion and find[s] that the severe depressed mental reaction suffered by the employee on January 8, 1954, constituted a personal injury within the meaning of the . . . act, and that such injury arose out of and in the course of his employment." The board further concluded that the employee's "state of mind was directly connected with his personal injury of January 8, 1954."

On certification to the Superior Court a decree was entered dismissing the claim for compensation. The decree recited that the "evidence of causal relationship between the death and employment . . . [was] insufficient to sustain the . . . [b]oard's decision." The claimant appealed.

In support of the decree below the insurer argues (1) that the employee did not receive a personal injury

arising out of and in the course of his employment; (2) that even if there was a personal injury within the meaning of the act the claimant (a) failed to sustain the burden of proving a causal connection between such injury and the employee's suicide, and in any event (b) failed to show "by the weight of the evidence that, due to the injury, the employee was of such unsoundness of mind as to make him irresponsible for his act of suicide.' "[1]

We assume that the employee's mental condition was a "personal injury" under the act. This is a question which has never been decided by this court and we do not now decide it, and in making this assumption we intend no intimation one way or the other. We are of opinion that there was insufficient evidence of a causal connection between the employment and the employee's mental condition.

The burden was on the claimant to prove that there was a probable causal connection. And where, as here, such causal relationship is a matter not within the knowledge or experience of laymen the relationship must be established by expert medical testimony. *Sevigny's Case,* 337 Mass. 747, 749, and cases cited. The only evidence on which a finding of causal relationship could rest is the testimony of Dr. Gardner, the psychiatrist called by the claimant. It was his testimony that was adopted by the reviewing board and furnished the basis for its decision.

Dr. Gardner, when pressed by claimant's counsel, was of opinion that the relationship which he said existed between the employment and the employee's mental condition and subsequent suicide was a probability rather than a possibility. Of course, if the relationship was no more than a possibility the claimant's case must fail. *Ruschetti's Case,*

---

[1] General Laws c. 152, § 26A, inserted by St. 1937, c. 370, § 2, reads in part: "Dependents shall not be precluded from recovery under this chapter . . . for death by suicide of the employee, if it be shown by the weight of the evidence that, due to the injury, the employee was of such unsoundness of mind as to make him irresponsible for his act of suicide." This statute unquestionably was enacted in view of the rule laid down in *Sponatski's Case,* 220 Mass. 526, 530, and *Tetrault's Case,* 278 Mass. 447, 448. Whether the words "weight of the evidence" in the statute were intended to alter the well established rule governing the effect of findings of the board (see *Hartman's Case,* 336 Mass. 508, 511, and cases cited) need not be decided.

299 Mass. 426, 431. *Josi's Case,* 324 Mass. 415. *Nass v. Duxbury,* 327 Mass. 396, 401. *Sevigny's Case,* 337 Mass. 747, 751. "A mere guess or conjecture by an expert witness in the form of a conclusion from basic facts that do not tend towards that conclusion any more than towards a contrary one, has . . . no evidential value." *Ruschetti's Case, supra,* at page 431.

With these principles in mind we proceed to an analysis of Dr. Gardner's testimony. The first employment-connected cause considered by him was the injury to the employee's finger in 1943. There was, in the doctor's opinion, "one possibility . . . [which had some effect, namely, because of] the accident to his hand . . ., he may have developed some emotional disturbance which would cause neurosis and fear of injury." But later Dr. Gardner testified that he "did not attach too much importance to . . . [that injury] because it is not a direct participating factor . . . but as long as there was some disability, it helped him to some depressive tendencies." The doctor's attention was directed to the fact that nearly ten years had elapsed following the 1943 injury during which there was no history of complaints by the employee. To this inquiry he gave the following explanation. "I was trying to go back of this man's history and show you what developed. All the experiences of our life have something to do with determining our reaction. We are getting pretty far afield; it is not of great importance but merely a theoretical consideration in my effort to put a diagnosis on this final reaction and when I went on the final stage of saying there was a causal relationship, I was trying to make it more specific. This long range gradual development of the thing was influenced by such an accident and the male climacteric being aggravated by the circumstances of this man's life [in] the last two years." It would appear that Dr. Gardner had in effect withdrawn one of the two employment connections on which his opinion was based.

The other possibility considered by Dr. Gardner as a basis for the causal relationship was that the employee be-

cause of his age ''could have developed a male climacteric,'' or change of life, two years before his death. Such a condition would cause one to have ''exceedingly strong morbid feelings.'' These ''fears again were aggravated in connection with his doing this outside work and . . . the final loss of his work led to his feeling that he was completely lost and hopeless.'' A severely depressed person, according to Dr. Gardner, is a ''possible suicide.'' Elsewhere in his testimony Dr. Gardner stated that the ''important thing to him was that for some reason . . . [the employee] was under great emotional stress,'' and that ''this emotional disturbance . . . seemed to relate itself over [the] last two years to out of town assignments with hiring men or climbing, or whatever — he does not know.''

We think that Dr. Gardner's ultimate opinion as to causal relationship, although clothed in the garb of probability, rests on foundations which, when analyzed, are no more than possibilities. To endow opinion evidence with probative value it must be based on something more than that. *Ruschetti's Case,* 299 Mass. 426, 431. *Brownhill* v. *Kivlin,* 317 Mass. 168, 170. *Nass* v. *Duxbury,* 327 Mass. 396, 402.

In view of this conclusion we do not reach questions arising under § 26A. See footnote 1.

*Decree affirmed.*