TROMBLEY *v.* COLDWATER STATE HOME AND
TRAINING SCHOOL.

WORKMEN'S COMPENSATION—ATTENDANT NURSE AT MENTAL INSTITU-
TION—SUICIDE—EQUALLY DIVIDED COURT.

Award of workmen's compensation to widow of employee who
committed suicide following period of depression after legis-
lative investigation of alleged mistreatment of patients at
mental institution, where husband had been employed as an
attendant nurse assigned to work with mentally defective
patients, is affirmed by an equally divided court (CL 1948,
§ 411.1 *et seq.*, as amended).

Appeal from Workmen's Compensation Appeal
Board. Submitted October 6, 1961. (Docket No. 34,
Calender No. 49,292.) Decided June 8, 1962.

Esther Trombley, widow of Charles Trombley,
presented her claim against the State of Michigan,
Coldwater State Home and Training School, employ-
er, and State Accident Fund, insurer, asking compen-
sation for death of husband who committed suicide
during course of legislative investigation. Award to
plaintiff. Defendants appeal. Affirmed by an equal-
ly divided court.

*Rapaport, Siegrist, Miatech & Edgar,* for plain-
tiff.

*Harry F. Briggs* (*Richard J. Anderson,* of coun-
sel), for defendants.

REFERENCES FOR POINTS IN HEADNOTE

58 Am Jur, Workmen's Compensation § 262.
Suicide as compensable under workmen's compensation act. 143
ALR 1227.

Carr, C. J. (*for reversal*). This case involves a number of features not directly involved in prior litigation in this State. The testimony is not in dispute as to the acts of Charles Trombley during the period particularly in question. The parties are not in accord, however, as to the inferences that may be drawn from his conduct, the ostensible reasons therefor, his demeanor claimed to have resulted from certain events over which he apparently had no control, and the circumstances under which he took his own life. At the time of his death Mr. Trombley was 37 years of age. He served in the army in the second world war. He was not wounded but was hospitalized because of asthma and neurosis. Prior to his discharge from said hospital he was married to the plaintiff in the present case.

In April, 1953, Mr. Trombley was employed by the Coldwater State Home and Training School as an attendant nurse, being assigned at the time of occurrences here involved to Cottage 43 where he worked with mentally defective patients. He continued in such employment until his death on October 23, 1958. The record indicates that his work was satisfactory, that it met with the approval of his superiors, and that he demonstrated his ability to perform his duties in a proper manner. During such period he suffered from the ailments for which he had been hospitalized in the army, and at the time of his death was drawing a government pension of $100 per month.

Among the patients in the cottage in which Mr. Trombley worked was Joseph Kibiloski. In some manner not disclosed by this record said patient sustained injuries as a result of which his relatives caused investigations to be made, including one by a legislative committee. In the course of such investigations a number of employees, including Mr. Trombley, were interrogated presumably in an attempt to

discover the facts with reference to the injury to the inmate. Because of the repeated interrogations, particularly by members of the legislative committee, Mr. Trombley became depressed. Apparently he felt that he was being unjustly accused, by the form of the questions propounded to him, of misconduct in the performance of his duties. It does not appear that he became angry or resentful, but felt aggrieved by what he considered accusations made unjustly against him.

He discussed the situation with friends who apparently undertook to improve his mental attitude toward events that were transpiring. Witnesses who had talked with him during this period testified in substance that while Mr. Trombley appeared to be depressed he did not indulge in manifestations of anger or lack of mental control but, on the contrary, appeared to have his faculties. Like testimony was given by the plaintiff in the present proceeding, and by her daughter. The sum total of such testimony indicates that while Mr. Trombley felt aggrieved by the repeated interrogation to which he was subjected he, nonetheless, maintained a calm demeanor and discussed the situation rationally with his friends.

During the evening prior to the day on which Mr. Trombley took his own life there was a television broadcast to the effect that the legislative committee was preparing to continue with its investigation. Mrs. Trombley was with her husband and both heard the announcement. According to her testimony, Mr. Trombley made no comment but threw up his hands and went to bed. The following excerpt from her testimony indicates the situation at the time:

"*Q.* Had Mr. Trombley had any difficulty sleeping before this investigation?
"*A.* No.
"*Q.* Did he have difficulty sleeping after?
"*A.* No, not unless he had an asthma attack. .

"*Q.* In other words, after you and Mr. Trombley heard the newscast, he threw up his arm, did he say anything?

"*A.* No, just threw his hands up, like that, and went to bed."

It further appears that the next morning Mr. Trombley got up without awakening his wife, dressed in his usual working garments, left the house without disturbing anyone, and drove to a somewhat secluded spot approximately 1 mile distant from his home where he shot himself in the chest with a rifle that he had in the car. There is no showing as to the time when the weapon was put in the automobile but Mrs. Trombley testified that it was habitually in the room occupied by herself and her husband, beneath the bed therein. Apparently death was instantaneous or practically so.

The present proceeding was instituted by Mrs. Trombley by application for hearing and adjustment of claim filed with the workmen's compensation department of the State on December 24, 1958. Said application was based on the occurrence of a "personal injury" on or about October 23, 1958, alleged as: "Suicide due to irresistible impulse caused by incidents in the course of employment." Defendants denied liability, alleging that plaintiff's claim was not based on the result of an occupational injury or disease and did not arise out of or in the course of employment. Following hearing the referee awarded compensation and the appeal board affirmed, holding that Mr. Trombley's death was directly due to the legislative "investigation and its sequelae." The appeal board further expressed the opinion that the death arose out of and in the course of the employment, adding thereto the statement: "we believe it was associated with an uncontrollable impulse and not voluntary action." On leave granted, defendants have appealed to this Court.

The mental condition which it is claimed resulted in Mr. Trombley taking his own life was not the result of a physical injury sustained by him in the course of his employment and arising from it. Neither was he afflicted with an occupational disease incurred in such employment. His asthma and neurosis afflicted him years prior to his entering the employ of the defendant State institution. It does not appear that either of such ailments was aggravated by his work. No claim is made that such was the fact. The uncontrollable impulse, if such there was, that impelled Mr. Trombley to take his own life was not the result of a physical injury or occupational disease compensable under the workmen's compensation law of the State.

It is of interest to note that in decisions in other States under pertinent compensation laws in which a claim for compensation has been based on the fact that the employee concerned took his own life while allegedly insane the question has repeatedly arisen as to the precise nature of the act. The inquiry has been in such cases whether death occurred because of an uncontrollable impulse, of which an injury was the proximate cause, or whether suicide was the result of a voluntary choice determined by the exercise of mental powers sufficient to realize the purpose and effect of the act. A comparison of the Massachusetts decisions in *Sponatski's Case,* 220 Mass 526 (108 NE 466, LRA1916A, 333), and *Ruschetti's Case,* 299 Mass 426 (13 NE2d 34), suggests the controlling principles in cases involving the right to compensation when it is claimed that suicide by an employee has resulted from a physical injury. In the first case the employee was injured by receiving a splash of molten lead in his eye causing the loss thereof and, according to the proofs, resulting in an abnormal mental condition. The proofs indicated that Sponatski without warning and apparently without premeditation

leaped from an open window in a hospital, the fall causing his death. In upholding the right to compensation under the Massachusetts statute the court referred to the rule followed in *Daniels* v. *New York, N. H. & H. R. Co.*, 183 Mass 393, 400 (67 NE 424, 62 LRA 751), saying (p 531):

"That rule applies to cases arising under the workmen's compensation act. It is that where there follows as the direct result of a physical injury an insanity of such violence as to cause the victim to take his own life through an uncontrollable impulse or in a delirium of frenzy 'without conscious volition to produce death, having knowledge of the physical nature and consequences of the act,' then there is a direct and unbroken causal connection between the physical injury and the death. But where the resulting insanity is such as to cause suicide through a voluntary wilful choice determined by a moderately intelligent mental power which knows the purpose and the physical effect of the suicidal act even though choice is dominated and ruled by a disordered mind, then there is a new and independent agency which breaks the chain of causation arising from the injury. See *McDonald* v. *Snelling*, 14 Allen (96 Mass) 290."

In *Ruschetti's Case, supra*, a physician called as a witness by the plaintiff testified that, in his opinion, the employee whose suicide was the basis for the claim for compensation under the statute and who had sustained a severe injury in the course of his employment, resulting in the amputation of an arm, took his own life as the result of an "uncontrollable impulse." Following the amputation the employee suffered much pain, was restless, and disinclined to talk. He finally committed suicide by hanging himself in a barn. In holding that the opinion of the medical witness in question was not sufficient to support an award of compensation on the theory that

death had resulted from an uncontrollable impulse of an insane man, it was said in part (pp 430–432):

"The burden was on the claimant to prove that the injury was the cause of the death, within the rule laid down in the cases cited. *Sponatski's Case,* 220 Mass 526, 527, 528 (108 NE 466, LRA1916A, 333). *Tetrault's Case,* 278 Mass 447, 448 (180 NE 231). The acts of the employee on the day of his death, up to the time when he was left alone in the barn, evidenced considerable reasoning powers. Nothing suggestive of frenzy or utter want of self control appears, beyond the mere fact of suicide. The manner of suicide involved some thought. The act was quite unlike the simple one of strangling one's self with a napkin, as in the *Daniels Case,* or jumping from a high place, as in the 2 cases last cited. Without the expert testimony, a tribunal could find that the injury was the cause of the death only by guess or conjecture rather than by a preponderance of the evidence. The decisive question is, whether the addition of the expert testimony afforded a sufficient basis for such a finding.   *   *   *

"A mere guess or conjecture by an expert witness in the form of a conclusion from basic facts that do not tend towards that conclusion any more than towards a contrary one, has been held to have no evidential value. *Blanchard's Case,* 277 Mass 413, 415 (178 NE 606); *Kramer* v. *New York Life Ins. Co.* 293 Mass 440, 445, 446 (200 NE 390); *Spear* v. *Hiles,* 67 Wis 361, 367 (30 NW 511); *Bucher* v. *Wisconsin Central R. Co.,* 139 Wis 597, 606, 607 (120 NW 518); *United States* v. *Hill* (CCA 8), 62 F2d 1022, 1025, 1026; *United States* v. *Owen* (CCA 5), 71 F2d 360. In *Dreher* v. *Order of United Commercial Travelers of America,* 173 Wis 173, 178, 179 (180 NW 815), the only evidence of death by external violence was a reddish spot on the skin over the temple and the testimony of a physician that because of the existence of that spot he was of opinion that death was caused by a blow on the temple. The

court said, "The opinion of the physician as to the cause of death is invoked to supply the substantive facts necessary to support his conclusion. This cannot be done. It is the function of opinion evidence to assist the jury in arriving at a correct conclusion upon a given state of facts. To endow opinion evidence with probative value it must be based on facts proven or assumed, sufficient to enable the expert to form an intelligent opinion. * * * [The physician] may be credited with the expression of his honest opinion concerning the cause of the death of the deceased. His opinion in that respect, however, could be nothing more than mere intuition or conjecture.' We think that the opinion of the physician called by the claimant in this case was of the same sort, and did not warrant the finding of the board."

In the instant case the appeal board in support of its opinion apparently relied on testimony given by a psychiatrist who was the medical superintendent of the Coldwater State Home and Training School. Such testimony is included in the following which indicates the leading and suggestive questions propounded to the witness:

"*Q.* My point is, this is a gradual, cumulative thing, is it?

"*A.* It can be.

"*Q.* Until finally there comes a time when the person can no longer take it?

"*A.* Yes, and that varies with the individual.

"*Q.* Yes, depending on whether it is steel, copper or lead, or what?

"*A.* Yes.

"*Q.* And once that point is reached, then this person is no longer in control of the situation?

"*A.* That's right.

"*Q.* And then what he does, although physically voluntary, is no longer mentally voluntary, is that right?

"*A.* That's right.

"*Q.* He can no longer cope with his environment, and he must destroy himself, is that true?

"*A.* That's true."

It must be borne in mind that the witness was not speaking with particular reference to Mr. Trombley but, on the contrary, was answering general questions. On cross-examination the witness further testified as follows:

"*Q.* Doctor, suicide may be a voluntary act, may it not?

"*A.* Yes, I think it may be voluntary.

"*Q.* Suicide may also be a planned act, planned over a period of time, planned with mechanical thoughts, may it not?

"*A.* Yes.

"*Q.* As to whether or not this was the case with Mr. Trombley, you don't know?

"*A.* I don't know."

It may be further noted that the witness, asked to give his opinion of the term "irresistible impulse" from a medical standpoint, answered:

"I don't say as I ever formed any opinion. It is a very difficult subject to discuss, and one which might be argued from many standpoints. I hold myself forth as no expert on the term 'irresistible impulse'—it has been used frequently in newspapers, stories, books, et cetera."

As before indicated, the undisputed testimony relating to Mr. Trombley's conduct on the day that he took his own life, and preceding that act, is wholly at variance with any possible theory that he shot himself in a moment of frenzy or pursuant to an uncontrollable or irresistible impulse. It was conceded by the superintendent of defendant institution that the conduct of Mr. Trombley leading up to the suicide indicated planning. The conclusion may not be avoided that such was the situation. Apparently he

left his home quietly after dressing himself, and inferentially removing the gun from beneath the bed in which his wife was sleeping, suggesting that he did not wish to disturb anyone. He did not take his life in proximity to the home. On the contrary, he drove some distance to a secluded spot in Coldwater, parked his car, took the weapon that he had brought with him, and ended his life. There is nothing in the facts disclosed by the proofs justifying a conclusion that he acted in an emotional frenzy or in obedience to an irresistible impulse. The specific testimony in this regard must be given controlling force. It may not be brushed aside on the basis of an opinion not founded on the specific facts in the case.

In accord with the holding of the Massachusetts court in *Ruschetti's Case, supra,* is *Industrial Commission of Ohio* v. *Brubaker,* 129 Ohio St 617 (196 NE 409). In that case Brubaker was injured while in the employ of a corporation subject to the workmen's compensation law of the State. He filed a claim for compensation, which was granted, and shortly thereafter committed suicide by shooting himself. Thereupon his widow filed a claim for death award, alleging that the employee's death by suicide was a result of the original injury. Her claim was sustained by the court of common pleas and by the court of appeals. On appeal the judgments entered in the lower courts were reversed. The proofs indicated that Brubaker on the Sunday morning that he committed suicide conversed in a reasonable manner and waited until his wife had gone to Sunday school before taking his own life. In reversing the judgments from which the State had appealed, the court quoted (p 623) with approval 1 Honnold on Workmen's Compensation, p 508, § 132, as follows:

"Where there follows as the direct result of a physical injury an insanity such as to cause the

workman to take his own life through an unaccountable impulse or in a delirium of frenzy without conscious volition to produce death, having knowledge of the physical consequences of his act, there is a direct and unbroken connection between the injury and the death. But where the resulting insanity is such as to cause suicide through a voluntary wilful choice determined by a moderately intelligent mental power which knows the purpose and the physical effect of the suicidal act, even though choice is dominated by a disordered mind, then there is a new and independent agency, which breaks the chain of causation arising from the injury."

The court concluded from the record before it that there was no testimony justifying a conclusion that Brubaker at the time he took his own life was incapable of entertaining a fixed purpose to commit suicide.

In accord with the foregoing decisions is *Barber* v. *Industrial Commission and Burrell Engineering Co.*, 241 Wis 462 (6 NW2d 199, 143 ALR 1222). There plaintiff sought to recover compensation because of the death of her husband by suicide. Barber was injured while in the employ of defendant Burrell Engineering Company, as the result of a fall. Following this occurrence he became moody and despondent, and approximately a year later he left his home, went to Canada, engaged a room in a hotel, and there committed suicide. The commission found from the proofs that in all probability Barber would not have taken his own life had it not been for the mental and physical conditions resulting from his injuries, but that he had rational knowledge of the consequences of his act and proceeded with conscious volition to produce his death. It was specifically held that the suicide did not result from insanity of such violence as to cause the decedent to take his own life in a delirium of frenzy without conscious volition nor while suffering severe

pain. It was held by the supreme court of the State that (p 464):

"The findings indicate that the injury to deceased produced certain physical disabilities, and that the pain and humiliation involved in these disabilities created what for deceased was an intolerable condition, and that he became profoundly depressed. With full knowledge of what he was doing he chose deliberately to end his life as an escape from these intolerable conditions. His morbid mental condition had not however progressed to the stage of insane frenzy. He still had moderately intelligent mental power, rational knowledge of the consequences of his act, and the capacity for conscious volition."

These foregoing decisions are fairly typical of cases from other States recognizing the general rule that workmen's compensation is not recoverable because of the suicide of an employee injured in the course of his employment, such injury arising therefrom, unless as a proven result the suicide has occurred in a moment of insane frenzy or because of irresistible impulse. Deliberate planning of an act of suicide, with mental ability to understand the nature of the act, involves the introduction of an intervening cause in the chain of circumstances to which cause the death must be attributed.

In the instant case counsel for appellants direct attention to part 2, § 2, of the workmen's compensation act of this State* which provides as follows:

"If the employee is injured by reason of his intentional and wilful misconduct, he shall not receive compensation under the provisions of this act." CL 1948, § 412.2 (Stat Ann 1960 Rev § 17.152).

As illustrative cases involving the application of the section quoted see *Fortin* v. *Beaver Coal Co.*, 217

---

* PA 1912 (1st Ex Sess), No 10, as amended (CL 1948, § 411.1 *et seq.*, as amended [Stat Ann 1960 Rev § 17.141 *et seq.*]).

Mich 508 (23 ALR 1153), and *Waldbauer* v. *Michigan Bean Co.*, 278 Mich 249.

Without discussing other questions suggested by the record in the case, we think it must be said that under the authorities above cited, and other cases of like nature recognizing the general rule, the claim presented here is not within the scope of the Michigan workmen's compensation act. In view of the positive proof as to the condition of Charles Trombley at the time and immediately preceding his taking his own life it may not be said that his act was committed in a moment of insane frenzy or as the result of an irresistible or uncontrollable impulse. The uncontradicted evidence as to what occurred, and particularly as to the conduct of Charles Trombley, may not be overcome by theoretical or speculative opinions having no reference to the particular facts in the case. The rule in workmen's compensation cases in this respect is analogous to that in tort actions involving like facts. See *Scheffer* v. *Railroad Company*, 105 US 249 (26 L ed 1070); *Long* v. *Omaha & C. B. St. R. Co.*, 108 Neb 342 (187 NW 930).

The above discussion covers the issue to which the arguments of counsel have been principally directed. The instant case may be properly determined by application of the principles found controlling in the decisions above cited. In accordance therewith plaintiff's claim for an award under the Michigan statute is not well founded. As before noted, there are a number of questions involved in the case, suggested by the unusual factual situation presented. We think that discussion of such questions is not required at this time, but note in passing that the application of the Michigan workmen's compensation act to a claim of the character now before us renders pertinent consideration of the decisions of this Court in *Chaudier* v. *Stearns & Culver Lumber Co.*, 206

Mich 433 (5 ALR 1673), and *Schneyder* v. *Cadillac Motor Car Co.*, 280 Mich 127.

The case should be remanded to the workmen's compensation appeal board with directions to set aside the award entered in plaintiff's favor and to enter an order denying compensation. Questions of statutory construction being involved, no costs should be allowed.

DETHMERS and KELLY, JJ., concurred with CARR, C. J.

SOURIS, J. (*for affirmance*). The workmen's compensation appeal board affirmed payment of benefits to plaintiff for her husband's death by suicide. Mr. Trombley had been an attendant nurse in one of the cottages at the Coldwater State Home and Training School for mentally retarded persons, one of whom died allegedly as a result of mistreatment. A legislative committee, and other official agencies, conducted investigations accompanied by substantial newspaper, radio and television publicity. Trombley was one of the employees of the home interrogated on several occasions. The appeal board found that the investigations precipitated a drastic personality change in Trombley and induced in him mental depression so noticeable that it caused concern to those around him. It found, further, that his act of suicide was an uncontrollable impulse, not a voluntary action, and that it was caused directly by the investigations. Because the appeal board found Trombley's suicidal death arose out of and in the course of his employment, it affirmed the award of compensation to his widow.

We have held that compensation benefits are payable for incapacity to work because of a claimant's mental disorder arising out of and in the course of his employment, whether or not such mental disorder results from a direct physical blow to claimant's

body.  *Carter* v. *General Motors Corporation,* 361
Mich 577, and cases referred to therein at p 585 and
pp 590–592.   However, we have not had occasion
previously to decide under what circumstances, if
ever, death benefits are payable under our act if such
work-connected mental disorder induces its victim to
commit suicide.   This case squarely presents that
issue for decision.

The problem with which we deal has been the sub-
ject of considerable scholarly effort.   Particularly
helpful have been the following:  1 Larson, Work-
men's Compensation, § 36.00 *et seq.*;  5 Schneider,
Workmen's Compensation (Perm ed), § 1411 (d–g);
Horovitz, Current Trends in Basic Principles of
Workmen's Compensation, 12 Law Soc J 605, 632–
634; 143 ALR 1227; 45 Iowa L Rev 669; 8 UCLA L
Rev 673.

It appears that the leading case on the subject, to
which most of the subsequent cases pay at least nom-
inal obeisance, is *Sponatski's Case* (1915), 220 Mass
526 (108 NE 466, LRA1916A, 333), relied upon in
this case by Mr. Chief Justice Carr.   The rule of
*Sponatski's Case,* as it has become known, permits
recovery only when the mental disorder was so vio-
lent that the victim committed suicide "through an
uncontrollable impulse or in a delirium of frenzy
without conscious volition to produce death."   Com-
pensation is barred, on the other hand, when suicide
is a "voluntary wilful choice determined by a mod-
erately intelligent mental power which knows the
purpose and the physical effect of the suicidal act
even though choice is dominated and ruled by a dis-
ordered mind."  *Ruschetti's Case* (1938), 299 Mass
426 (13 NE2d 34); *Industrial Commission of Ohio* v.
*Brubaker* (1935), 129 Ohio St 617 (196 NE 409);
*Schofield* v. *White* (1959), 250 Iowa 571 (95 NW2d
40); *Barber* v. *Industrial Commission and Burrell
Engineering Co.* (1942), 241 Wis 462 (6 NW2d 199,

143 ALR 1222). This test compels inquiry into the specific state of mind of the decedent as of the moment of suicide, a task which is today not much more certain of determination than it was in 1915 when *Sponatski* was decided.

Some few American courts, Florida, California, New York, Mississippi, and recently Illinois, follow a rule which, generally speaking, allows compensation upon a showing of causal connection between the decedent's employment, his injury or mental disorder and his suicide. This approach regards such suicide as a compensable consequence of a work-connected injury or mental disorder, not as an intervening cause of death. It also obviates the necessity for assessing the "precise quality" (*Harper* v. *Industrial Commission* [1962], 24 Ill 2d 103 [180 NE2d 480]), of the decedent's mental condition at the moment of suicide to the extent required by *Sponatski*. In those States, like Michigan, which have statutory provisions[1] barring recovery of compensation if injury or death results from intentional or wilful action by the decedent employee, the decedent's mental derangement need only be found to have so impaired his reasoning faculties that his act of suicide was not voluntary in the sense that term is used to describe rational choice of alternatives. *Whitehead* v. *Keene Roofing Co.* (Fla, 1949), 43 So2d 464; *Burnight* v. *Industrial Accident Commission* (1960), 181 Cal App 2d 816 (5 Cal Rptr 786); *Delinousha* v. *National Biscuit Co.* (1928), 248 NY 93 (161 NE 431); *Maricle* v. *Glazier* (1954), 283 App Div 402 (128 NYS2d 148), affirmed 307 NY 738 (121 NE2d 549); *Prentiss Truck & Tractor Co.* v. *Spencer* (1956), 228 Miss 66 (87 So 2d 272, 88 So 2d 99); and *Harper* v. *Industrial Commission, supra*. See, also, *Voris* v. *Texas Employer's Insurance Association* (CCA 5, 1951), 190 F2d 929.

---

[1] CL 1948, § 412.2 (Stat Ann 1960 Rev § 17.152).

As I read this record, the award of the appeal board must be affirmed if either of the 2 rules stated above is applied to the facts. Trombley, at death, was 37 years of age. He had been employed at the defendant State institution for about 5 years and had performed his duties as an attendant nurse completely satisfactorily. His employment records disclosed he had received satisfactory ratings from his supervisors, who reported also that he was interested in his job, capable, dependable, cooperative, interested in the welfare of the patients and very alert to their needs, seemingly enjoyed his work, and was well liked by other attendants and patients. There was no evidence that he acted abnormally in any way in the performance of his duties and there was testimony that his employment records would have so indicated had his superiors been apprised thereof.

His adult stepdaughter and his widow testified that he was the epitome of the good father and husband, a good provider, interested in the activities of his children and stepchildren without partiality, jovial, even-tempered, sought enjoyment in fishing and hunting and picking odd species of mushrooms. Except for the effect the investigation into the injury and subsequent death of the State home's patient had upon Trombley, his widow knew no other reason for his suicide. The Trombleys were buying their own home and were always able to pay for their purchases. He was in good health except for periodic attacks of bronchial asthma which sometimes disturbed his sleep and, until the last 2 years of his life, occasionally caused him to pass into unconsciousness. However, he had adjusted well to his asthmatic condition and was able to control it by use of an atomizer and new medicine his doctor had prescribed.

Trombley's widow testified that she met him in 1945 while he was a patient for about 2 months in an army psychiatric hospital after combat in Europe

and that during the subsequent years of their marriage he received a government disability pension, which finally reached $100 per month, for his asthmatic condition and for "neurosis." The record discloses nothing more about such neurosis.

The conduct of the legislative committee's investigation had a devastating effect upon Trombley. The personnel director of defendant State home, called by claimant under the statute[2] for cross-examination, testified that everyone at the home interrogated by the committee was upset by the experience which, he said, "wasn't any picnic." During the several weeks the investigation continued, both before and after the injured patient's death, Trombley was called by the committee for questioning on a number of different occasions.

His stepdaughter testified that after the investigation started Trombley lost interest in his home and children, he lost his previously hearty appetite and would sit in a chair with his face in his hands or with his hands folded. There was a complete change,— he was a different man. Eventually the committee left town for a while and he seemed to feel a little better, but not much. On the night preceding his suicide, his stepdaughter found Trombley sitting up in a chair when she returned home. Apparently Trombley had gone to bed earlier in the evening, but had arisen by the time his stepdaughter returned home. He did not answer her questions. He just sat there deep in thought, seemingly without hearing her.

Mrs. Trombley testified similarly. She said that after the investigation commenced he was completely changed, "like somebody that had been completely whipped." On the night preceding the suicide, a television newscaster announced return of the legis-

2 CL 1948, § 617.66 (Stat Ann § 27.915).

lative committee to Coldwater, whereupon Trombley threw up his hands and went to bed. The only person shown to have seen him alive thereafter was his stepdaughter, as related above. Apparently the following morning, he dressed in a uniform he wore only at work and, contrary to his habit, drove away from home without awakening his wife to have breakfast with her. His body was found near his car about 1 mile from his home, a rifle bullet having ended his life.

There is nothing in this record to indicate that Trombley had any responsibility for the patient's injuries and death. In fact, the record suggests that investigating agencies other than the legislative committee cleared Trombley of wrongdoing, which fact he was going to be told the day he killed himself.

Dr. Edwin Rennell, defendant's medical superintendent, a psychiatrist, was called as a witness by claimant for cross-examination under the statute.[3] In response to hypothetical questions based upon fair statements of the evidence produced, Dr. Rennell testified it was his opinion that the investigation would be comparable to a traumatic event; that it could have been mentally traumatic to a person like Trombley, precipitating a mental condition whereby he lost his judgment of right and wrong, suicide itself being a symptom of such loss of judgment, and whereby he experienced an irresistible impulse to destroy himself; and that evidence of a change in personality following inception of the investigation would buttress his opinion. Based upon the facts as they had been given to him in the series of hypothetical questions, Dr. Rennell stated his opinion to be that Trombley's suicide was not a deliberate decision but was, rather, the consequence of a deranged mind. He explained that humans, like various

3 See CL 1948, § 617.66 (Stat Ann § 27.915).—Reporter.

metals, differ in the amount of stress and strain they can withstand but that each has his breaking point. Once that breaking point is reached, he testified, the subject is no longer in control, he can no longer cope with his environment, and he must destroy himself.

It has been suggested that the expert opinion testimony in this record was theoretical or speculative without reference to the particular facts in the case. I find nothing in such testimony to indicate other than that it was based upon the evidence previously adduced and carefully stated in the hypothetical questions by which such opinion evidence was extracted on cross-examination. Such testimony is, by its nature, designed to inform the trier of facts of matters of specialized knowledge beyond the knowledge of laymen. Our current court rule on the use of such evidence (Court Rule No 37, § 16 [1945])[4] is designed to remove previously existing restrictions thereon, and now allows admission of opinion testimony on the ultimate fact to be decided. However, it does not forbid the use of hypothetical questions in accordance with our precedent practice. Dr. Rennell's cross-examination was entirely consistent with such precedent practice.

The foregoing summary of the evidence seems to me to support beyond question the findings of the appeal board. It was that board's finding that Trombley reacted to an uncontrollable impulse in committing suicide, an uncontrollable impulse which was the product of a mental condition of depression and drastic personality change caused by his involvement in a legislative committee's investigation of occurrences at his place of employment with the State. Whether we affirm the appeal board on the ground that its finding is consistent with *Sponatski's* rule (which allows payment of benefits when the

[4] Added July 31, 1957; effective January 1, 1958. See 349 Mich xiii.—REPORTER.

work-connected mental disorder was so violent that the victim committed suicide [p 530] "through an uncontrollable impulse or in a delirium of frenzy without conscious volition to produce death") or with the minority rule (which allows payment of benefits upon a showing that the work-connected mental disorder so impaired the victim's reasoning faculties that his act of suicide was not voluntary) is of no importance to the parties in this litigation.

However, the application of *Sponatski's* rule in other States has produced such apparently absurd results that I would reject it. The difficulty usually is encountered in applying the language of the opinion in *Sponatski's Case* which bars compensation when suicide is a (p 530) "voluntary wilful choice determined by a moderately intelligent mental power which knows the purpose and the physical effect of the suicidal act even though choice is dominated and ruled by a disordered mind." In January of this year Mr. Justice Schaefer, of the Illinois supreme court, had occasion to analyze the *Sponatski* rule in his opinion in *Harper* v. *Industrial Commission, supra*. His analysis considers the major objections to *Sponatski* expressed by legal scholars and other courts, objections which I believe are valid and require our rejection of its rule:

"Although the test formulated in the *Sponatski Case* has been followed in a number of other jurisdictions (see cases collected 143 ALR 1227 and 56 ALR 459), it has certain rather clear deficiencies. It seems to assume that a man's capacity to choose is a constant, unvariable factor, unaffected by whatever stresses may be brought to bear against it, and so it minimizes to the point of exclusion the possibility that capacity to choose may itself be impaired as the result of a compensable injury. If any degree of choice or volition remains, recovery is to be barred 'even though choice is dominated and

ruled by a disordered mind,'—which by hypothesis means a mind that has become disordered as the result of the injury for which compensation is sought. To us this underlying assumption of the *Sponatski* test is dubious, both from a medical and from a legal point of view. Neither the record before us, the briefs of the parties, nor the opinions that have adopted the *Sponatski* test suggest that its basic assumption rests upon responsible medical opinion. And so far as the law is concerned, it regularly recognizes, in a multitude of situations subsumed under the concept of duress, that freedom of choice may be so impaired by extrinsic pressures, physical and mental, as to deprive conduct of its normal legal significance.

"The *Sponatski* test has been vigorously criticized for its failure to recognize the role which pain or despair may play in breaking down a rational mental process. (1 Larson, Workmen's Compensation [1952], § 36.30; Horovitz, Injury and Death under Workmen's Compensation Laws [1944], pp 134–136; 8 UCLA L Rev 673 [1961]; 45 Iowa L Rev 669 [1960]; *cf.* 1 U of Chicago L Rev 105 [1933].) It has been pointed out that the rule that there can be no recovery unless the suicide occurs 'through an uncontrollable impulse or in a delirium of frenzy without conscious volition to produce death,' practically excludes from compensation those cases not marked by some violent or eccentric method of self-destruction. (1 Larson, Workmen's Compensation Law [1952], § 36.20.) And it has been stated that it is erroneous as a matter of law to characterize a suicide as an intervening cause when it is attributable to a psychosis that results from a compensable injury. 'The slashing of the wrist was an intervening act, but not an intervening cause. An intervening cause is one occurring entirely independent of a prior cause. When a first cause produces a second cause that produces a result, the first cause is the cause of that result.' Fowler, J., dissenting in *Barber* v. *Industrial Commission and Burrell Engi-*

*neering Co.* (1942), 241 Wis 462, 467 (6 NW2d 199, 143 ALR 1222)."

I would affirm the appeal board on the ground that the evidence discloses Trombley's mental disorder was caused by the legislative committee's investigation and that it so impaired his reasoning faculties that his act of suicide was not voluntary and, therefore, not intentional or wilful within the meaning of CL 1948, § 412.2 (Stat Ann 1960 Rev § 17.152).

BLACK and KAVANAGH, JJ., concurred with SOURIS, J.

OTIS M. SMITH and ADAMS, JJ., took no part in the decision of this case.