William THOMAS, Claimant–Appellant,

v.

CITY OF SPRINGFIELD, Missouri,
Employer–Respondent.

No. 24849.

Missouri Court of Appeals,
Southern District,
Division One.

Sept. 30, 2002.

Motion for Rehearing or Transfer
Denied Oct. 18, 2002.

Application for Transfer Denied
Nov. 26, 2002.

John C. Banning, Reynolds, Gold & Grosser, Springfield, for appellant.

Richard L. Schnake and Patrick J. Platter, Springfield, for respondent.

PHILLIP R. GARRISON, Judge.

William Thomas ("Thomas") appeals from the ruling of the Missouri Labor and Industrial Relations Commission ("Commission") affirming the decision of an administrative law judge ("ALJ") denying Thomas workers' compensation benefits for an injury sustained during his employment as a police officer by the City of Springfield, Missouri ("City"). The judgment of the Commission is affirmed.

Thomas is an eighteen-year veteran of the Springfield, Missouri Police Department ("Department"). At the time of the incident in question, he was, and since 1988 had been, a detective with the Department, having been promoted from patrolman. In 1993, Thomas joined the newly formed Major Case Response Team ("MCRT"), a four-person unit within the Department's detective corps that investigates major crimes such as homicide, kidnapping and rape. Thomas' duties with MCRT included obtaining information needed to acquire search warrants and supervising the execution of those warrants. During that same time, Thomas also was a member of the Southwest Central Major Case Squad, a multi-jurisdictional unit charged with investigating crimes of regional significance.

In April 1998, Thomas accepted what was to be a temporary assignment as acting sergeant of detectives in the Department's Crimes Against Persons unit. His duties as acting sergeant included supervising detectives assigned to the criminal investigations section, as well as responding to citizen concerns and inquiries regarding ongoing criminal investigations. From 1988 to 1998, the workload of Thomas' criminal investigations section increased steadily, while the number of new detectives assigned to the force remained virtually constant. Thomas remained an active member of MCRT during his entire stint as acting detective, until the incident in question on March 23, 1999. Essentially, he had been assigned two full-time jobs, and was the only person ever to have been assigned both roles in the Department.

On numerous occasions, beginning in January 1998, Thomas requested, unsuccessfully, to be relieved either from his duties with MCRT or, more frequently, from his duties as acting sergeant. Thomas' stated reasons included a desire to spend more time with his family, and to reduce what was becoming an unbearably stressful workload. The requests to be moved from MCRT were denied, at least in part because of a desire on the part of Thomas' supervisor, Lieutenant Steve Hamilton ("Hamilton"), not to disrupt what he considered to be a productive working relationship between Thomas and the other members of the team. The denial of requests to be relieved of acting sergeant duties stemmed, according to Hamilton, from a promotion freeze instituted by the Department in the face of civil litigation brought by the police officers' union.

In the six-month period leading up to the incident in question, an unprecedented spate of homicides occurred in Springfield, which greatly intensified the workload of MCRT. One of these cases involved the brutal slayings of a pregnant mother, her unborn child and her three minor children. Another involved the asphyxiation of a child by her mother ("Robbins case") in the course of an unsuccessful suicide attempt. Thomas was the lead investigator in the Robbins case, and was to testify at the nationally televised murder trial on March 24, 1999.

On the preceding evening of March 23, 1999, Thomas arrived home from work and withdrew to his bedroom to continue his study of the facts to which he was to testify the following day. For some time leading up to that night, Thomas had been suffering from an inability to recall or memorize the facts in the Robbins case. He became moody, withdrawn and unable to sleep or eat in the days leading up to the trial, as he became increasingly apprehensive about the possibility of "embarrassing" himself, his family, and the Department at trial. His concern was compounded by his perception that the defense attorney in the Robbins case had a penchant for attacking the personal

credibility of Department witnesses, and by his fear that past voluntary treatment for alcohol abuse might be revealed during his televised testimony.

Sometime after retreating to his bedroom, Thomas got up from his bed and retrieved his service revolver from the top of a closet shelf. As was always the case, the gun was loaded. Thomas returned to his bed, lay down, and decided to shoot himself in the heart. He decided against shooting himself in the head, believing it would create too much of a "mess" for his wife and children. Thomas fired one shot into his chest or abdomen as he lay on the bed. Hearing the noise, Thomas' teenage son, and, later, Thomas' wife, came into the bedroom. Thomas, still conscious, instructed his son to "leave [him] alone," but his wife summoned an ambulance, and he was taken to Cox Medical Center in Springfield, where he was treated for injuries to his stomach, intestine, pancreas, and spine. The bullet severed his spinal cord, resulting in complete loss of sensation and function below the abdomen. He suffers now from persistent bedsores, and pain in his back where a metal cage has replaced a destroyed vertebra. He requires daily nursing, much of which is performed by his wife, and spends his days confined to a wheelchair or reclining lounge chair. He is totally and permanently disabled.

On May 3, 1999, Thomas filed a Claim for Compensation with the Division of Workers' Compensation ("Division") claiming that "[d]ue to performing his extraordinarily and unusually stressful job duties, [Thomas] suffered a mental injury that caused a physical injury." City filed a response on May 27, 1999, stating, *inter alia*, that "the injuries alleged in [Thom-

as'] claim were self-inflicted and, as a result, compensation cannot be awarded." Final hearing of Thomas' claim was held December 11–12, 2000 before an ALJ. During the hearing, extensive testimony was taken from Thomas, his wife, his detective peers, and medical experts, all of which established the high level of stress under which Thomas labored in the months leading up to his shooting. Sharply disputed, however, was whether that stress was so "extraordinary and unusual" as to be compensable, and whether Thomas had the "mental power" on March 23, 1999 to form the requisite intent to kill himself. If not, his injury would be noncompensable under the Workers' Compensation Law.[1]

On August 27, 2001, the ALJ issued an award denying any compensation for Thomas. In his Findings of Fact and Rulings of Law, the ALJ acknowledged the "constant and significant" stress created by performing what essentially were two full-time jobs in MCRT and acting sergeant, coupled with the uncharacteristic rash of homicides in late 1998 and early 1999. However, this stress, in the view of the ALJ, "was not so extraordinary and unusual as to be compensable under Section 287.120.8" Additionally, the ALJ found that Thomas' injuries were self-inflicted and intentional, so that his injuries were not compensable, per Section 287.120(3). The ALJ found that Thomas "could recognize the consequences of his actions" on the night he shot himself, and that he "had the requisite mental status to appreciate the natural consequences of his actions when he shot himself with the intention of killing himself[.]"

---

1. Section 287.010 et. seq. All references to statutes are to RSMo (2000) unless otherwise indicated.

Following a timely Application for Review, the Commission, over one dissent, issued a Final Award Denying Compensation. The Commission incorporated *in toto* the findings of fact and law enunciated by the ALJ, finding that they were "supported by competent and substantial evidence." Thomas appeals.

In cases considering an award granted by the Commission in a workers' compensation claim, we "review only questions of law" and may reverse the award only upon a finding that the commission exceeded its powers, the award was fraudulently procured, the facts found by the commission do not support the award, or there was not sufficient competent evidence in the record supporting the award. Section 287.495. The standard of appellate review of compensation awards of the Commission was aptly stated by the western district of this court in *Davis v. Research Medical Center*, 903 S.W.2d 557 (Mo.App. W.D.1995):

> [we] may not substitute [our] judgment on the evidence for that of the Commission. The weight of the evidence and the credibility of witnesses are ultimately for the Commission. [We apply] a two-step process designed to determine whether the Commission could have reasonably made its findings and award upon consideration of all the evidence before it. In the first step, [we examine] the whole record, viewing the evidence and all reasonable inferences drawn therefrom in the light most favorable to the award, to determine if the record contains sufficient competent and substantial evidence to support the award.... If there is competent and substantial evidence supporting the award, [we move] to the second step, where [we view] the evidence in the light most favorable to the award, but must consider all evidence in the record, including that which opposes or is unfavorable to the award, take account of the overall effect of all of the evidence, and determine whether the award is against the overwhelming weight of the evidence. In doing so, [we] take into consideration the credibility determinations of the Commission[.] Findings and awards of the Commission which are clearly the interpretation or application of the law, as distinguished from a determination of facts, are not binding ... and fall within [our] province of independent review and correction where erroneous. And, where the findings of ultimate fact are reached not by a process of natural reasoning from the facts alone, but rather by application of law, it is a conclusion of law and subject to reversal[.]

*Id.* at 571. To emphasize, the foregoing standard concerns only our review of the Commission's findings of fact; it has long been settled that conclusions of law are reviewed *de novo* by this court. *Id.* at 560 (citing *Merriman v. Ben Gutman Truck Serv. Inc.*, 392 S.W.2d 292, 297 (Mo.1965)).

Thomas argues, *inter alia*, that the Commission erred in finding that his injury was intentionally inflicted, in that the job-induced stress under which he labored rendered him incapable of forming the requisite mental state to perform an intentional act of suicide. The standard of review set out above, together with Missouri's present stance on the issue of compensable suicide, require us to reject this argument.

Section 287.120(3) provides, in pertinent part, that "[n]o compensation shall be allowed ... for ... injury or death due to [an] employee's intentional self-inflicted injury." Thomas concedes that the injury he suffered on March 23, 1999 was self-inflicted. The sole remaining issue under this argument, then, is whether the injury was intentionally inflicted.

■ While all jurisdictions require that a worker's suicide or, presumably, attempted but unsuccessful suicide be caused by a work-related mental or physical stressor in order to be compensable under workers' compensation, there is considerable disagreement as to "the degree and manifestations of derangement necessary, the directness of the causal relationship between it and the work-connected injury required, and the type of injury or activity accepted as one which may lead to a compensable suicide." Leslie A. Bradshaw, Annotation, *Suicide as Compensable Under Workmen's Compensation Act*, 15 A.L.R.3d 616, 621 (1967). The overwhelming majority of jurisdictions, in attempting to define terms such as "intentional" in this context, adhere to variations of the so-called "chain of causation" rule, under which a suicide is compensable if "[a compensable] injury and its consequences directly cause the employee to become devoid of normal judgment and dominated by a disturbance of the mind which leads to suicide." Bradshaw at 622. In many of these jurisdictions, the "chain of causation" test has a decades-long history. *See, e.g. Stroer v. Georgia Pacific Corp.*, 672 P.2d 1158 (Okla.1983); *McDonald v. Atlantic Steel Co.*, 133 Ga.App. 157, 210 S.E.2d 344 (1974); *Petty v. Associated Transp. Inc.*, 276 N.C. 417, 173 S.E.2d 321 (1970); *Graver Tank and Mfg. Co. v. Indust. Comm'n*, 97 Ariz. 256, 399 P.2d 664 (1965); *Harper v. Indust. Comm'n*, 24 Ill.2d 103, 180 N.E.2d 480 (1962); *Trombley v. State*, 366 Mich. 649, 115 N.W.2d 561 (1962); *Burnight v. Indust. Accident Comm'n*, 181 Cal.App.2d 816, 5 Cal.Rptr. 786 (Cal.App. 1960); *Prentiss Truck and Tractor Co. v. Spencer*, 228 Miss. 66, 87 So.2d 272 (1956); *Whitehead v. Keene Roofing Co.*, 43 So.2d 464 (Fla.1949); *Wilder v. Russell Library Co.*, 107 Conn. 56, 139 A. 644 (1927). Under this test, if the claimant can show an "unbroken chain of causation" between a compensable injury, whether physical or mental, a mental disturbance, and the attempted suicide, the resulting· death or injury also is compensable. *Stroer* at 1161. Courts that have adopted it have held that "[t]his standard best reflects the socio-economic purpose of" workers' compensation laws. *Id.* That purpose is "to provide financial and medical benefits to the victims of 'work-connected' injuries and to their families—regardless of fault— and to allocate the financial burden to the most appropriate source, the employer, and, ultimately, the consumer." Bradshaw at 622. This policy underlies Missouri's own approach to adjudicating workers' compensation claims, specifically, that "[the Workers' Compensation Law] should be liberally construed in favor of the employee." *Mershon v. Missouri Public Serv. Corp.*, 359 Mo. 257, 221 S.W.2d 165, 167 (1949).

■ Notwithstanding the growing prevalence of the "chain of causation" rule in other jurisdictions, Missouri continues to adhere to the so-called "Sponatski" test, originally stated in *In re Sponatski*, 220 Mass. 526, 108 N.E. 466 (1915). Under this harsher rule, a suicide or attempt thereof is compensable only if "(1) as the result of a physical injury, (2) the [worker] was possessed of an uncontrollable impulse to commit suicide or was in a delirium of frenzy, (3) did not consciously intend to kill himself, and (4) did not realize the consequences of his act of self-destruction." Bradshaw at 622. At one time or another, eleven jurisdictions have adopted the Sponatski rule, but the number firmly adhering to the rule has dwindled to five, including Missouri. *See Anderson v. Armour and Co.*, 257 Minn. 281, 101 N.W.2d 435 (1960); *Schofield v. White*, 250 Iowa 571, 95 N.W.2d 40 (Iowa 1959); *Mershon*, 359 Mo. 257, 221 S.W.2d 165; *Jones v. Traders & General Ins. Co.*, 144 S.W.2d 689 (Tex.

Civ.App.1940); *Gatterdam v. Dept. of Labor and Indust.*, 185 Wash. 628, 56 P.2d 693 (1936):

In *Mershon*, the leading Missouri case on this issue, a lineman for a utility company was found dead next to a bloody knife, with which he apparently had cut his throat. There were marks resembling burns on his hands and clothing. The claimant-widow in *Mershon* argued that hysteria induced by the pain of electric shock drove her husband to take his own life, and that his death was compensable notwithstanding the prohibition on compensation for self-inflicted, intentional injuries, due to his act being unintentional because of the pain-induced frenzy. The referee[2] rejected the claim, which decision was affirmed both by the Commission and the circuit court.[3] The Missouri Supreme Court affirmed, finding the decision was "abundantly supported" by the required "competent and substantial evidence." *Id.* at 169. In language pivotal to the instant case, the Court noted the claimant's concession "that Mershon took his own life. The nature of the wound and Mershon's open, bloody knife lying near his hand unerringly point to intentional suicide unless his mind was so disordered that he could not form such intention.... Concede that self-destruction is never prompted by a normal mind, yet if done with *sufficient mental power to know the purpose and effect* of the act, even though dominated by a disordered mind, it is intentional suicide." *Id.* (emphasis added).

The *Mershon* court's decision to embrace this narrow "purpose and effect" test, or "Sponatski" rule, dooms Thomas'

argument to failure. Despite his protests to the contrary, the "purpose and effect" test remains viable in Missouri. Thomas suggests that *Kolde by Kolde v. St. Louis County*, 809 S.W.2d 14 (Mo.App. E.D. 1991), brands *Mershon* as "too simplistic because it ignores the requirement of an intentional mental state" and that "per *Kolde*, the fact that [Thomas] purposely put the gun to his chest and knew the effect of pulling the trigger is, as a matter of law, legally insufficient to prove an intentional mental state." Thomas' reliance on *Kolde* is misplaced. In the first place, *Mershon* remains the most recent controlling decision of the Missouri Supreme Court and, as such, this court is constitutionally bound to follow its holding. Mo. Const. Art. V, Sec. 2; *In re Marriage of Eikermann*, 48 S.W.3d 605, 609 (Mo.App. S.D.2001) (citing *State ex. rel. FAG Bearings Corp. v. Perigo*, 8 S.W.3d 118, 123 (Mo.App. S.D.1999)). Secondly, even if we were authorized to follow *Kolde*, that case does not in any way stand for the proposition Thomas suggests. We find no hint whatsoever in *Kolde* that the eastern district of this court considered *Mershon* "too simplistic" an approach to interpreting Section 287.120(3) and its bar to compensating intentional, self-inflicted injury. In fact, the court in *Kolde*, a case remarkably similar factually to the instant case, matter-of-factly based its succinct analysis of the claimant's Section 287.120(3) argument on *Mershon*, and came to the unavoidable conclusion that a police officer who is shown by his employer to "[know] the purpose and effect of pointing his gun at his [body] and pulling the trigger" com-

---

**2.** At the time *Mershon* was decided, the modern ALJ was called a "referee."

**3.** At the time *Mershon* was decided, the Workers' Compensation Law provided that a final award of the Commission was appealed to the appropriate circuit court, with the Court of

Appeals having no direct original appellate jurisdiction. *See Davis* at 562. After August 13, 1980, awards of the Commission are appealed directly to the Court of Appeals. Section 287.495.

mits an intentional, non-compensable act. *Kolde* at 16.

■ Pursuant to the standard of review summarized in *Davis*, we have reviewed the whole record before us and find "sufficient competent and substantial evidence to support" the Commission's finding that Thomas' acts on the evening of March 23, 1999 were intentional. Indeed, Thomas admits in his brief to this court that he "*purposely* put the gun to his chest and *knew the effect* of pulling the trigger" (emphasis added), a concession that is virtually compelled by the nature of his testimony before the ALJ. There, he stated that he knew the gun was loaded, that he intentionally pointed it at his chest, that he knew it would fire if he pulled the trigger, and that he shot himself with the "hope" it would end his life. He admitted to having chosen his chest as his target rather than his head, in order to avoid making a mess with which his family would have to contend.

■ Having found sufficient competent and substantial evidence to support the Commission's finding of intentional, self-inflicted injury, we next consider the entire record, "including that which opposes or is unfavorable to the award, take account of the overall effect of all of the evidence, and determine whether the award is against the overwhelming weight of the evidence." *Davis* at 571. We find it is not. "When courts speak of the 'weight of the evidence,' they mean its weight in probative value, not the quantity or amount thereof." *Chatmon v. St. Charles County Ambulance Dist.*, 55 S.W.3d 451, 455 (Mo.App. E.D.2001). The Commission was justified in putting great weight upon the testimony of Thomas concerning his own state of mind on the evening of March 23, 1999, wherein he admitted to knowing at least the immediate purpose and effect of shooting himself. Additionally, three of the four mental health experts who testified at Thomas' hearing conceded he knew the purpose and effect of shooting himself, and that his act, was therefore, intentional in a narrow sense. Only Dr. Clifford Whipple, a clinical psychologist who testified for Thomas, contended that Thomas was not "making a deliberate, rational decision . . . [with a] full awareness of the outcome" and, according to Dr. Whipple's understanding of the term, was not acting intentionally. Were Missouri to adopt the more lenient "chain of causation" test for defining an intentional act in this context, Dr. Whipple's understanding of Thomas' mindset might be more probative. However, while it appears clear from the record that Thomas suffered from some level of clinical depression, and that his acts the evening of March 23, 1999 were not rational, the weight of the evidence does not refute the finding that he met the rather low threshold for meeting the "purpose and effect" test set out in *Mershon* and its progeny.

This court is not unmindful of the tragic loss visited upon Thomas, his family, and the Department as a result of the events leading up to this claim. It is clear to us that Thomas was for eighteen years an exemplary police officer, well respected by his peers, those in his charge, and his supervisors. The law, however, is clear. The court in *Mershon* established the narrow "purpose and effect" test for defining an intentional act under the Workers' Compensation Law and we are bound by that case. We are unable to find reversible error in the Commission's finding that Thomas' injuries were self-inflicted and intentional, rendering them non-compensable under Section 287.120(3). The Com-

mission's award is, therefore, affirmed.[4]

MONTGOMERY, P.J., and BARNEY, J., concur.

---

**4.** Thomas also argues, under two separate but related points relied on, that the Commission erred in finding that his job-related stress was not "extraordinary and unusual" as required by Section 287.120(8) in order to be a compensable mental injury. Were we not compelled by *Mershon* to find the injuries of March 23, 1999 to be self-inflicted and intentional, i.e., if the "chain of causation" test were viable in Missouri as elsewhere, this argument would be germane; a compensable original injury would need to be established. Having found the shooting to be intentional, however, the nature of Thomas' work-related stress becomes moot and we do not address this argument directly.