JOSEPH LIPIC, JR., and EMIL LIPIC, as Successor Trustees Under Declaration of Trust of JOSEPH LIPIC, SR., as Beneficiaries of the Trust, and as Individuals, Plaintiffs, Appellants, LEONARD LIPIC and WALTER LIPIC, Plaintiffs, v. GERTRUDE WHEELER and MARIE PHELAN, Defendants, Respondents, 42383—242 S. W. (2d) 43.

Division One, September 10, 1951.

500

*Charles A. Neumann* and *William Kohn* for appellants.

*Roberts P. Elam* for respondents Gertrude Wheeler and Marie Phelan.

504

■ LOZIER, C.—This case involves final distribution of a trust fund. As submitted below, four of six beneficiaries as such, and two of them as successor co-trustees, were plaintiffs. Defendants were the other two beneficiaries. All parties asked determination of their rights, final distribution of the trust estate under court supervision, and allowance of attorneys' fees. The two co-trustees asked allowance for their services. Defendants asked removal of the co-trustees ■ for alleged breaches of trust, and collection, by their court-appointed successor, of an alleged deficiency in trust assets at the time of the death of the settlor and original trustee. Some of the findings of fact were made by a special master. The two plaintiffs-successor trustees appealed from an adverse judgment. The appeal is properly here because of the amount involved.

The issues require construction of a declaration of trust, the validity of which none of the parties challenge. The principal issue is appellants' liability, as successor trustees, for failure to collect alleged trust assets from the estate of the deceased predecessor trustee of which estate the appellants-successor trustees were also co-executors and legatees.

There was no conflict in the evidence as to the material facts. Joseph Lipic Sr. died testate on February 5, 1946, survived by: his widow, Agatha; five sons, Joseph Jr., Emil, Walter and Leonard, plaintiffs below, and Sylvester; and two daughters, Gertrude Wheeler and Marie Phelan, defendants below. His will was duly probated. After making several small charitable bequests, he bequeathed his interest in the Jos. Lipic Pen Co. to Joseph Jr., Emil and Leonard, left the residuum to his widow and nominated Joseph Jr. and Emil as co-executors. These two qualified and are still serving as such co-executors.

On July 2, 1943, Joseph Lipic Sr. executed and put into effect a declaration of trust wherein and whereby he vested in himself "as trustee, all my right, title and interest in" and "the full legal title to" the notes and securing trust deeds and the real estate property "set forth in the list attached hereto marked 'Assets of Trust of Joseph Lipic Sr.' together with all reinvestments of the proceeds of the sales of said deeds of trust or real estate in said list." During his lifetime he was to "administer said trust property, and any other property which may from time to time be added thereto by me, or which may be a reinvestment of the present property listed in the assets of the trust estate for my benefit during my lifetime, reserving the right of income as fully as if said trust property were my sole property." Joseph Jr. and Emil were to become successor trustees when Joseph Sr. died.

The list, entitled "Assets of Trust of Joseph Lipic Sr.," described eight real estate loans and securing trust deeds, and showed the balances of principal then due. These balances totaled $29,950. The final item was: "Real Estate (value $3,000), 2751 Shenandoah St.," followed by a brief description of the property. The nine items totaled $32,500. This list is hereinafter referred to as Exhibit A.

The trust assets received by the successor trustees were listed in Exhibit C. This described seven real estate loans and securing trust deeds, the principal balances of which total $26,800, $3150 less than the principal balances of the eight loans listed in Exhibit A. Five of the Exhibit A loans, totaling $18,250, were not listed in Exhibit C. Exhibit C listed three of the Exhibit A loans, or renewals thereof, totaling $11,300, $400 less than the principal balances of these three loans as listed in Exhibit A. Exhibit C listed five loans, totaling $15,500, not listed in Exhibit A.

Exhibit C listed no real estate. After setting up the trust, Joseph Sr. sold the Shenandoah St. property for $3500, and one of the Exhibit C loans was taken as part payment of the purchase price. The principal balance of this loan was $2,000 when Joseph Sr. died.

The seven Exhibit C items totaled $27,800, $6150 less than the nine Exhibit A items. The successor trustees were held liable below for this $6150, for the $500 excess of the sale price of the Shenandoah St. property over its Exhibit A valuation, and for $1733.63, 6% interest upon the total of the two items, $6650.

We must first determine whether these loans and this $500 claim the co-trustees failed to press against their father's estate, of which they themselves were co-executors and legatees, were actually parts of the trust corpus when they became successor trustees. If these were not trust assets when Joseph Sr. died, there was no breach of the duty of a trustee "to take reasonable steps to take and keep control of the trust property." Restatement, Trusts, Sec. 175.

The final paragraph of the trust declaration was: "I also reserve full power and right to amend or alter this trust from time to time as I shall deem proper and expedient, or name or substitute a new or additional trustee." In this court, the parties agree that Joseph Sr. thus reserved full power to amend or alter the trust or even revoke it entirely. They also agree that Joseph Sr. was not required to exercise any of these powers by written instrument. They also agree that where no method of exercise is specified, alteration or partial revocation powers may be exercised in any manner sufficiently manifesting an intention to alter or to partially revoke. We need not discuss the cases the parties cite. In each, the principles just stated were reannounced and applied to the facts of that particular case. We must apply these principles to the facts here. Did Joseph Sr.'s handling of the trust assets show an intention to amend or partially revoke the trust? This matter was not ruled below.

It is our conclusion that this settlor's conduct showed an intention to alter or modify the trust by reducing the total of the trust assets; and that his conduct was entirely consistent with that intention and wholly inconsistent with an intent to revoke the trust in toto. This conclusion is based upon uncontradicted evidence. Joseph Sr. kept the trust declaration, the attached list (Exhibit A) and all the papers relating to the assets of this trust in an unlabeled paper package in a bank deposit box. He also kept his personal papers in this box, separate and apart, however, from the package. The box was held in the pen company's name. Access to the box could be had only by Joseph Sr. singly or by Joseph Jr. and Emil jointly.

About ten days before he died, Joseph Sr. sent for Emil and asked him to go to the box, saying: "In there you will find a package. Will you go in that package and take out a deed on Connecticut St. and deliver it to Mr. Rengel?" (Rengel was with the real estate firm which handled Joseph Sr.'s loan transactions.) Emil's recollection was that his father said that the loan on this property was to be paid off. Joseph Sr. also instructed Emil to take from the package two envelopes and deliver one each to Mrs. Wheeler and Mrs. Phelan. Joseph Jr. and Emil went to the bank, took the Connecticut St. property loan papers and the two envelopes out of the package and Emil made the deliveries requested by his father.

The two envelopes were plain, had no writing on the outside and were sealed. Joseph Jr. and Emil did not know what the envelopes contained but Emil said, "they felt like money." When he made the separate deliveries of the envelopes, Emil told Mrs. Wheeler and Mrs. Phelan, "Here's some money pop told me to deliver to you."

About ten days after Joseph Sr. died, Joseph Jr. and Emil went to the office of Charles A. Neumann, their father's attorney. Neumann told them that he had drawn a will for Joseph Sr. and suggested they look for it in the box. He also suggested that they look for a

trust declaration he had drawn and some deeds of trust. They returned to his office with the will and the package. As Neumann recalled, the trust declaration was in an envelope "with my name on top of it, that we lawyers use. It was sealed. * * * The will was in an envelope of that kind and was sealed and it had on it, 'Last Will and Testament of Joseph Lipic.'" Neumann thought, but was not sure, because his "custom was always to put a heading on the envelope, that is, an identification on it. I was under the impression that I had the stenographer put on there, 'Declaration of Trust by Joseph Lipic.' * * * And then there were deeds of trust each in a separate manila envelope, as the real estate men use, a place for the description and amount, and the whole thing was wrapped in a brown sheet of paper and had a rubber band about it. The will was separate. The trust declaration and deeds of trust were in this package." The trust deeds to which he referred were those listed in Exhibit C.

Joseph Sr. obviously treated the package as the repository of the trust declaration, the initial list and the trust assets. He kept no bank account as trustee and apparently kept all trust assets in the package. ▉ From it, he withdrew some initial loans, and into it he placed others. From it, he withdrew the warranty deed to the Shenandoah St. real estate, and into it, he placed the Shenandoah St. property purchase money note and trust deed. (But not, apparently, any of the cash received in that transaction. If he put any such cash in the package, he later withdrew it. The two plain envelopes delivered to defendants may have contained money. In any event, there was no money in the package when he died.) In that package, he had once placed two unmarked envelopes which contained, if not currency, some documents which he evidently considered trust assets. In that package, he placed the loan papers on the Connecticut St. property, not one of the initial loans but one which he seems to have treated as an additional or substitute asset. And, ten days before he died, he had the Connecticut St. property loan papers taken from that package and delivered to his agent for collection. (The principal of this loan was paid off after Joseph Sr. died and was listed in Exhibit C.) At the same time, he had the two unmarked envelopes taken from that package and delivered to the defendants.

Joseph Sr. never transferred the record legal title to the Shenandoah St. real estate to himself as trustee, and when he sold that property he conveyed as individual owner. And, so far as appears, he used the proceeds of that sale, and thereafter placed the equivalent of only $2,000 thereof (the balance on the purchase money note) in that package.

Joseph Sr.'s conduct does not even suggest an intention to revoke the trust in toto. He did not disclose the existence of the trust and kept the trust declaration and the trust assets entirely within his

control. Yet, he was careful to segregate from his individual papers all of the documents relating to what he regarded as changing trust assets, and to keep all such documents, together with the trust declaration itself, in a separate package. That package was in the box when he died. His conduct under all the circumstances is most persuasive that, from time to time, he deliberately and intentionally exercised his reserved power to alter the trust; and that such exercises were wholly consistent with the continued existence of the trust iself but entirely inconsistent with any intention of maintaining the trust corpus at its initial value.

We rule that the $6150 and $500 items were not trust assets when Joseph Sr. died, and that, accordingly, the successor trustees are not liable for failing to attempt to secure these items for the trust estate. It follows that they would not be liable for the $1733.63, interest upon the $6150 and $500 items.

The trial court properly refused to charge against defendants the $2500 claimed to have been in the two envelopes removed from the package and delivered to them. As defendants did not testify, there was no evidence of what the envelopes contained. And, under the co-trustees' own theory, which we have sustained, the contents of the envelopes were not trust assets when Joseph Sr. died.

Other breaches of trust charged by defendants were failure to keep part of the trust assets invested and failure to make final distribution of the trust estate. The trust declaration provided: "After my death, said trust shall continue for a period of one (1) year after the date of the appointment of my executor or executors, and shall then be liquidated as soon as may be practical and expedient, as hereinafter set forth. Upon my death, my sons, Joseph Lipic Jr. and Emil Lipic, shall become the successor trustees, with full power and authority to administer said trust, and to sell, exchange, and reinvest any property belonging to said trust estate, in their sole name and capacity as successor trustees, with such incidental powers as the collection of rent, income and interest, as may be necessary for the purpose of managing said trust estate and its assets. After the expiration of the year mentioned herein, computed from the date of the appointment of the executor or executors of my estate, the successor trustees shall liquidate, or divide the assets of this trust in equal shares between my children: Joseph Lipic Jr., Emil Lipic, Walter Lipic, Leonard Lipic, Mary Phelan, and Gertrude Wheeler, and this trust shall then terminate. * * *''

█ Before considering the alleged failures to invest and to make final distribution, we note other assignments made by defendants. Advised by counsel to start a trust account, the co-trustees opened an account in the name of "Emil Lipic or Joseph Lipic Jr." on April 18, 1946. They testified that it never entered their minds that "we should have hooked on to the end of our names, 'trustees.'" This

failure to earmark the trust assets was a breach of trust. Restatement, Trusts, Secs. 179, 180. After their attorney had discovered how the account was being carried, he advised them to have it properly entered. On February 24, 1948, they closed the old account and transferred the balance to a new account in their names as "successor trustees u/w of Joseph Lipic Sr., Dec.'d." It is noted that the trust estate sustained no loss from this particular breach of trust.

It is not clear when Joseph Jr. and Emil notified Leonard and Walter of the existence of the trust and that they were acting as co-trustees. But it was conceded that Mrs. Wheeler's and Mrs. Phelan's first knowledge was when they were served with process in this suit, filed on December 30, 1947. That was twenty-two months after Joseph Jr. and Emil opened the package, read the trust declaration and undertook to act as successor trustees. We agree that such concealment was a breach of trust. See Restatement, Trusts, Secs. 173, 183.

Next, Joseph Jr.'s and Emil's interests as trustees were adverse to their interests as co-executors and legatees of their father's estate. Wiegand v. Woerner, 155 Mo. App. 227, 134 SW 596. This concealment of the trust's existence and their delay in seeking the advice of a court of equity as to their respective duties as co-trustees and as co-executors, appear to have been a violation of the duty of a trustee to refrain from having conflicting interests. See Restatement, Trusts, Sec. 170; Bogert, Trusts & Trustees, Vol. 3, Pt. 1, Sec. 543.

The trial judge held the co-trustees liable for $1994.59, 6% interest to trial time upon cash received and kept in a non-interest bearing bank account, from dates of receipt until March 3, 1949. On that date, the co-trustees bought approximately $23,000 of U. S. Treasury 1¼% notes. The receipts were payments of principal of loans bearing either 4%, 5%, 5½% or 6%. These payments varied from $100 to $8000. They began very shortly after the co-trustees discovered the trust declaration in February, 1946, and continued until November, 1948. The larger payments were $4000, February 15, 1946; $1300, June 18, 1946; $2200, July 17, 1947; $8000, November 20, 1947; $1750, May 21, 1948; and $1750, November 21, 1948. The evidence was that between February 16, 1946, and March 3, 1949, short-term investment of trust funds in $100 denominations was not available and that the returns of such investment in larger denominations was only from 1% to 1½%.

The co-trustees contend that, under the trust declaration, they were obligated, not to invest the assets, but to liquidate them for purposes of final distribution; and that, in any event, they should not be held liable for interest in excess of 1½%. However, for reasons hereinafter set out, we concur in the trial judge's conclusion that the co-trustees should be charged 6% interest upon these funds.

█ As to their failure to make final distribution "as soon as may be practical and expedient" after February 15, 1947 (one year after the appointment of the executors of the Joseph Sr. estate), the co-trustees contend that distribution could not have been made (and still cannot be made) until the amounts of the federal estate and state inheritance taxes payable by the Joseph Sr. estate have been ascertained, and the liability of the trust estate for its pro rata share thereof, has been determined. There is merit in this assignment.

█ As co-executors of the Joseph Sr. estate, Joseph Jr. and Emil filed both federal estate and state inheritance tax returns in which the trust assets were listed as assets of the Joseph Sr. estate. The amounts of these taxes have not been finally determined. As co-trustees, Joseph Jr. and Emil made neither a federal estate nor a state inheritance tax return. The liability of the █ trust estate for its pro rata part of the taxes payable by the Joseph Sr. estate was not ruled below. The parties here agree that, absent state statutory requirements or the provisions of the will or trust declaration, the trust estate is not liable for such pro rata of federal estate taxes, and that no such statutory requirements exist in Missouri.

Joseph Sr.'s will was silent as to taxes. One of the provisions of the trust declaration authorized the successor trustees "to pay any and all taxes which may be assessed against the property included in this trust, whether state, municipal, federal, income or inheritance taxes, and to sell part of the trust estate property for such purpose."

Defendants assert that this tax provision "relates to taxes 'assessed' against the property included in the trust, and federal estate taxes are not 'assessed' against the trust property." Furthermore, they contend, as the provision does not mention "estate" taxes, the intention was to exclude federal estate taxes.

We cannot so strictly construe the tax provision. On the contrary, it is quite clear that Joseph Sr. intended that the trust estate be obligated for *any and all* taxes which his own estate was legally obligated to pay upon the trust assets. See Priedeman v. Jamison, 356 Mo. 627, 202 SW 2d 900. Assuming that federal estate taxes are not technically "assessed" against trust assets, we do not believe that Joseph Sr. used "assessed" in a narrow sense or that he meant a technical "tax assessment." Similarly, we think that he used "inheritance taxes" in the broad sense of "state or federal 'death duties' " and not with any thought of including state "inheritance" taxes and excluding federal "estate" taxes. See Ferguson v. Massachusetts Audubon Soc., 316 Mass. 436, 55 NE 2d 891.

The very presence of the tax provision shows Joseph Sr.'s intention to shift from his own estate some of the taxes for which that estate would be liable on account of the trust assets. And we think he meant just what he said—"any and all taxes." See Priedeman v. Jamison, supra. And note again the authorization for the sale of part of the

trust assets for the purpose of paying the tax obligations he had imposed upon the trust estate. Read in its entirety, the tax provision reflects a clear intent to require the. trust estate, and ultimately the trust beneficiaries, to bear its and their shares of all "death duties," including the federal estate tax.

It is immaterial whether the tax provision was mandatory. The co-trustees have shown their intent to act under this authorization and to reimburse the Joseph Sr. estate the trust estate's pro rata share of these taxes when same are ascertained. They cannot do so until the amounts are finally determined. They may have to sell some of the trust assets to secure funds with which to pay the taxes. They must act in this matter prior to final distribution. We hold that the co-trustees are entitled to reimburse the Joseph Sr. estate the trust's pro rata share of these taxes and take credit therefor in the final distribution of the trust estate. See In re Poe's Estate, 356 Mo. 276, 201 SW 2d 441.

We need not rule whether the pendency of certain litigation between some of the instant parties would justify the co-trustees' failure to make distribution. However, the pendency of one of the suits is of significance, though not in justification either of the co-trustees' failure to seek equity's guidance or their failure to make distribution. Briefly, Mrs. Wheeler, as administratrix d.b.n. of her mother's estate, sued Joseph Jr. and Emil, as co-executors of Joseph Sr.'s estate, for alleged conversion of assets of her mother's estate by Joseph Sr. as administrator of her mother's estate. Among the properties involved were three loans listed upon Exhibit A, totaling $12,500. (See State ex rel. Lipic v. Flynn, 358 Mo. 429, 215 SW 2d 446. In the Matter of the Estate of Emma Lipic, Deceased, an appeal in a suit between Mrs. Wheeler and Joseph Jr. and Emil, involving the same issue of discovery of assets, is now pending in this court.)

We agree with the trial judge that, in all probability, had the successor trustees promptly disclosed the existence of the trust and asked judicial guidance in its █ administration, the other suits would not have been instituted. In any event, the fact remains that Joseph Jr. and Emil continued to withhold from the other beneficiaries information they were obligated to disclose.

We have found that the co-trustees were not obligated to try to collect the $6650 from their father's estate and were not liable for interest thereon. The record shows that they accounted for all of the trust assets that came into their possession and for all income thereon actually received thereafter. Defendants do not contend otherwise. On the other hand, the co-trustees' deliberate suppression of knowledge of the trust's existence, their secret acceptance of the trusteeship and their surreptitious administration of the trust for nearly two years—during all of which time, they conceded, they did

"perceive here a divided duty"—cannot be justified. For twenty-two months they declined to seek the advice and guidance of a court of equity in the administration of the trust. Their conduct may have been the cause of the other litigation which, in turn, may still further postpone distribution of the trust's final net assets. Knowing that final distribution could not be made until the tax questions and the matters involved in the other suits were settled, they failed, for over a period of three years, to reinvest funds. Like the servant who traded not with his one talent but "went and digged in the earth and hid his lord's money," these co-trustees neglected to secure any interest whatsoever upon substantial portions of the trust assets. Their conduct requires that they be held liable for 6% interest on these funds, $1994.59.

We also believe that by their conduct, especially by their delay in seeking the aid of a court of equity, the co-trustees have forfeited any rights to compensation for their services or to reimbursement for their attorneys' fees. See Restatement, Trusts, Sec. 243; Bogert, Trusts & Trustees, Vol. 4, Pt. 2, Sec. 979; Anno. 110 ALR 566; Wiegand v. Woerner, supra.

However, as the co-trustees did not embezzle or appropriate any of the trust assets they received when their father died, and, as we have ruled the principal issue in their favor, they should not be required to pay all of the costs below. Such costs, accrued and hereafter accruing, should be assessed equally among the six beneficiaries,—the four plaintiffs and the two defendants. See Wiegand v. Woerner, supra. (These costs include the allowances of $1000 for services and $35 for expenses of the special master. The record shows that the trial judge did not abuse his discretion in making these allowances.) One-sixth of the appeal costs are taxed against each of the six parties.

The judgment is reversed and the cause is remanded with directions to enter judgment as of the date of the original judgment, October 16, 1950, in conformity with our rulings herein, and to retain jurisdiction of the cause for the purposes of supervising further administration of the trust by the co-trustees and final distribution among the six beneficiaries. *Van Osdol* and *Coil, CC.*, concur.

PER CURIAM:—The foregoing opinion by LOZIER, C., is adopted as the opinion of the court. All the judges concur.