SALEM UNITED METHODIST CHURCH and Salem Public Library, Plaintiffs–Respondents,

v.

Bill BOTTORFF and Jacqueline Bottorff, Defendants–Appellants,

Salem Nutrition Site, Linda Bottorff Wood, and Curtis Bottorff, Individually and as Trustee of the First Amended Arnold B. Bottorff Trust, Defendants.

No. 25622.

Missouri Court of Appeals, Southern District, Division Two.

July 14, 2004.

R. Brooks Kenagy, Steelville, MO, for appellants.

W.H. Thomas, Jr., Emily Woodward, Rolla, MO, for respondents.

JEFFREY W. BATES, Judge.

The unusual issue presented in this appeal is whether a Missouri trust can be revoked by physical act, rather than by compliance with the method of revocation specified in the trust. This question arose because, after the settlor's death, all three signed copies of his amended trust were discovered with the distributive provisions torn from the documents. The trial court ruled that the amended trust was still valid because the evidence presented was insufficient to support the conclusion that the distributive provisions were torn out by the settlor with the intent to revoke the trust, and there was no proof of compliance with the specific method of revocation required by the terms of the amended trust. We affirm the trial court's judgment.

## I. Standard of Review

In this court-tried case, our review is governed by Rule 84.13(d) and the principles articulated in *Murphy v. Car-*

*ron,* 536 S.W.2d 30, 32 (Mo. banc 1976).[1] We must affirm the trial court's judgment unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Bean v. Bean,* 115 S.W.3d 388, 392 (Mo.App.2003). We review the evidence and all reasonable inferences in the light most favorable to the judgment and disregard all contrary evidence and inferences. *Ketcherside v. McLane,* 118 S.W.3d 631, 634 (Mo.App.2003). Credibility of the witnesses and the weight to be given to their testimony is for the trial court, which is free to believe none, part, or all of the testimony of any witness. *Id.* Our summary of the evidence, which is set forth below, has been prepared in accordance with these principles.

## II. Facts and Procedural History

Arnold B. Bottorff ("Arnold") was born in Dent County, Missouri. His parents resided in Salem, Missouri.[2] Arnold went to school in Springfield, Missouri, and then attended the National University in Mexico City. Thereafter, he taught school in Alton, Missouri, and in California and Colorado. In the early 1970's, Arnold returned to live in Dent County and built a house east of Salem, where he lived for about 10 years. In the early 1980's, he moved into a mobile home near the Baptist church in Salem. Arnold never married and had no children. His relatives included two brothers, Bill Bottorff ("Bill") and James A. Bottorff ("James"); one niece, Linda Bottorff Wood ("Linda"); and one nephew, Curtis Bottorff ("Curtis"). Curtis is Bill's son.

On April 24, 1995, Arnold created a revocable trust agreement by executing trust documents prepared by Salem attorney Mark Weaver ("Weaver"). Arnold was the trust's grantor and trustee. Curtis was named successor trustee. As grantor, Arnold transferred to himself as trustee items of property listed in a schedule attached to the trust. The schedule included a number of parcels of real property and personal property described as "Certificates of Deposit, Stocks and Bonds, Household furnishings [and] Bank accounts." Also attached was an assignment of tangible personal property executed by Arnold as trustee and an acceptance of same executed by him as trustee. Arnold reserved the right to amend or revoke the trust in Section 2.1, which stated:

> Grantor, during his lifetime, expressly reserves the right and power, at any time and from time to time, to withdraw all or any part of the property then constituting the trust, to amend any or all of its provisions or to revoke the trust in its entirety, provided, however, that any amendment shall be effected by a written instrument signed and acknowledged by Grantor which shall be delivered to the then acting Trustees, and provided further that the duties and responsibilities of the Trustees hereunder may not be changed without the prior written consent of the then acting Trustees.

Thus, no particular method had to be used to revoke the trust. The original trust contained the following distributive provisions: (1) $200,000 to the Salem United Methodist Church ("Church"), with one-half of the money reserved exclusively for the benefit of its music program; (2)

---

**1.** All references to rules are to the Missouri Rules of Civil Procedure (2004).

**2.** In our opinion, we will refer to the individual members of the Bottorff family by their first names because four of the five have the same surname. We do so for purposes of clarity and intend no disrespect.

$60,000 to the Salem Public Library ("Library"); (3) $5,000 to the Salem Nutrition Center ("Nutrition Center") for meal purposes; (4) $25,000 to Arnold's nephew, Curtis; (5) $20,000 to Arnold's niece, Linda; and (6) $20,000 to Arnold's brother, James. These cash distributions were to be made by liquidating trust assets, except for stocks and securities owned by the trust. The stocks and bonds were to be transferred to Curtis, Linda and James as tenants in common in equal one-third shares. If any trust assets remained after the cash distributions were made, the remainder was to be distributed in the same fashion as the stocks and bonds. The trust made no provision for Arnold's brother, Bill.

On the same date the original trust was created, Arnold executed his Last Will and Testament. The will contained a pour-over provision naming the trust as the remainder beneficiary after payment of specified expenses.

As noted above, the terms of the original trust gave Arnold the right to make amendments thereto. He did so on July 18, 1997, by executing in triplicate his first amended trust. Weaver prepared the amended trust documents. Arnold was the grantor and trustee of the amended trust, and Curtis was named successor trustee. As before, the amended trust recited that Arnold was transferring property to the trust. Another assignment of tangible personal property executed by Arnold as grantor and trustee and a revised Schedule A, which listed certain real and personal property being transferred to the trust, were attached to the amended trust. The amended trust contained three differences from the original trust that are significant here.

First, the distributive provisions were changed. Pursuant to Article V, Section B, the remainder of the trust estate, ex-cluding certain tangible personal property distributed via written list, was to be allocated by percentage in the following manner: (1) 55% to the Church, with one-half of this amount specifically designated for the music program; (2) 20% to the Library; (3) 20% to James, with a proviso that his wife, Jacqueline, was to receive his share if James predeceased Arnold; and (4) 5% to the Nutrition Center for meal purposes.

Second, the trust terms dealing with revocation were substantially amended. Article II, Section C, states in pertinent part:

**ARTICLE II. Reservation of Rights in Grantor.** The GRANTOR reserves the right during GRANTOR'S lifetime and without consent of the TRUSTEE:

. . . .

B. To change, alter, or amend this trust agreement by written instrument, executed by the GRANTOR and delivered to the TRUSTEE hereunder. . . .

C. To revoke or vacate this trust in whole or in part, or to withdraw any of the trust property from the operation of this trust at any time during the GRANTOR'S lifetime. Such revocation or vacation of this trust agreement, or such withdrawal of property shall be effected by GRANTOR giving written notice to the TRUSTEE of the GRANTOR'S intentions in this regard, and upon the receipt of any such notice by the TRUSTEE, the TRUSTEE shall make, execute, and deliver to the GRANTOR such instruments in writing (including deeds, bills of sale, or otherwise) as may be necessary to release to the GRANTOR any and all rights which the TRUSTEE may have acquired in any of the properties of the trust estate.

Thus, the original trust provision requiring any amendments to the trust to be in writing was broadened to cover changes or alterations of the trust agreement itself. More importantly, Arnold's reserved power to revoke the trust was narrowly circumscribed by permitting only one method of revocation, which involved two separate steps: (1) giving written notice of revocation to the trustee; and (2) the subsequent preparation and delivery by trustee of written instruments needed to release the trustee's rights in the properties belonging to the trust estate.

Third, a new article was added the trust. Article X stated that it was to be "construed under and be regulated by the laws of the State of Missouri, and the validity and effect of this agreement shall be determined in accordance with the laws of Missouri."

In September 1999, Arnold moved from his mobile home into the Salem Residential Care Center ("Care Center") because of advancing age and declining health. Arnold's amended trust documents and his will were kept in his safe deposit box at the U.S. Bank. In July 2000, Bill's name was added to the list of persons authorized to enter the box. On September 26, 2000, Arnold asked Bill to go to the bank and get his trust documents. Bill obtained the documents and delivered them to Arnold in his room at the Care Center. Arnold kept the trust documents in his room, where other residents, staff and visitors at the Care Center would have had access to them.

On October 10, 2000, Arnold suddenly became ill and was taken the hospital. He died there on October 11, 2000, at the age of 86. That same day, Bill and Curtis went to the Care Center to clean out Ar-

nold's room. The trust documents were found in the drawer of a night table in the room. Bill and Curtis took the documents back to the bank and placed them in the safe deposit box.

About two weeks after Arnold died, Bill and Curtis brought a number of documents to Weaver. The amended trust documents were among the papers delivered to him. As he examined the three original amended trusts, he noticed that most of the sixth page of each document was torn off. The missing pages included the distribution scheme set out in Section B of Article V. After discovering this, Weaver was able to obtain a complete, but unsigned, copy of the amended trust from his computerized office files.

Arnold's will was admitted to probate in September 2001. The only assets requiring administration were a few minor stocks still titled in Arnold's name, which became assets of the trust estate through the will's pour-over provision. All of Arnold's other assets were still titled in the name of his trust.

In October 2001, the Church and the Library (referred to collectively as "Respondents") filed a declaratory judgment action in the Circuit Court of Dent County, Missouri. Their petition asked the court to determine that the amended trust was valid and had not been revoked at the time of Arnold's death. Named as defendants in the action were: (1) James; (2) the Nutrition Center; (3) Linda; (4) Bill; and (5) Curtis, both individually and in his capacity as successor trustee.[3] The individual defendants later filed a counterclaim against Respondents, as well as a cross-claim against the Nutrition Center. These pleadings asked the trial court to declare

**3.** After the declaratory judgment action was filed, James died. His wife, Jacqueline, was substituted as a party defendant in his stead.

that the first amended trust had been revoked prior to Arnold's death.[4] The individual defendants took the position that, if the amended trust was revoked, the estate would pass by intestacy with Bill and James splitting the estate equally.[5]

At trial, Respondents introduced in evidence the original trust, the three signed copies of the amended trust in the condition they were found after Arnold's death, and Weaver's unsigned office copy of the complete amended trust with its distributive provisions intact. Respondents also presented evidence concerning Arnold's involvement with their organizations and his expressed intentions to provide for them in his estate plan. Respondents' position at trial was that the amended trust had not been revoked and was still valid at the time of Arnold's death.

The individual defendants took the position the amended trust had been revoked, based on the following facts. First, during the six months prior to Arnold's death, he said he wanted to change the allocation made to Church in the amended trust. Second, about two weeks before he died, he asked to meet with Weaver again to amend the trust. Third, all executed copies of the amended trust were found after Arnold's death with the distributive portions of the documents torn out. The individual defendants' evidence, however, also showed without dispute several other important facts: (1) Arnold expressed no dissatisfaction about the allocations he made in the amended trust to the other benefi-

ciaries named therein; (2) he did not give any written notice of his intent to revoke the trust; (3) as trustee, he executed no written instruments transferring trust assets back to his individual control before his death; and (4) he made no statements indicating that he intended for his estate, which was worth approximately $500,000, to pass by intestate succession. The individual defendants' primary argument was that § 474.400 applied to this trust and permitted its revocation by the physical act of tearing out the page containing its distributive provisions.[6] Alternatively, they argued that compliance with the specific two-step method of revocation set out in the trust was unnecessary because Arnold was both settlor and trustee.

After hearing the evidence, the trial court took the case under advisement. Thereafter, the court entered a judgment, supported by thorough findings of fact and conclusions of law, that the amended trust was valid for the reasons previously stated. Only Bill and Jacqueline ("Appellants") filed a notice of appeal from the judgment.

### III. Discussion and Decision

Appellants present two points for decision. Each point is based on the premise that Arnold was the person who tore the pages from his trust documents and that he did so with the intent to revoke the trust in its entirety. For the purpose of reviewing these points, we will assume—without so deciding—that both of these facts are true.[7]

---

4. As an individual, Curtis joined with the other defendants in making these claims. In his capacity as trustee, he did not take a position concerning whether the trust had been revoked.

5. Since we conclude no revocation occurred, it is unnecessary for us to decide whether the property would pass by intestacy if the amended trust was revoked.

6. All references to statutes are to RSMo (2000) unless otherwise indicated.

7. After hearing the testimony, the trial court reached a different conclusion. It decided that "[t]he evidence adduced at trial is not sufficient to support a presumption that decedent tore the amended trust with intent to revoke." The court's conclusion was supported by its factual findings that: (1) other

*Point I*

In Appellants' first point, they argue the trial court's conclusion that Arnold could not revoke his amended trust by the physical act of tearing out the distributive provisions on each signed copy of the trust was error. Appellants contend this ruling is not supported by the evidence and misapplied the law because revocation of a trust by physical act is authorized by § 474.400.

We initially note that Arnold's amended trust stated it was to be "construed under and be regulated by the laws of the State of Missouri, and the validity and effect of this agreement shall be determined in accordance with the laws of Missouri." Therefore, we first review Missouri's decisional law on when and how an *inter vivos* trust can be revoked. A completely executed voluntary trust will be enforced, and it is irrevocable unless a power of revocation is reserved. *Krause v. Jeannette Inv. Co.*, 333 Mo. 509, 62 S.W.2d 890, 895 (1933). If no power of revocation is reserved, the trust can be revoked only with the consent of all beneficiaries. *Id.* If a power of revocation is reserved, but no particular method is specified, the power to revoke may be exercised in any manner sufficiently manifesting an intention to revoke the trust. *See Lipic v. Wheeler*, 362 Mo. 499, 242 S.W.2d 43, 46 (1951). Conversely, if the settlor reserves a power to revoke the trust only in a particular manner or under particular circumstances, he can revoke the trust only in that manner and under those circumstances. *Love v. St. Louis Union Trust Co.*, 497 S.W.2d 154, 159 (Mo. banc 1973); *In re Estate of Mueller*, 933 S.W.2d 903, 907 (Mo.App.1996). The foregoing principles of Missouri law are in accord with those expressed in a number of general authorities on trust law. *See, e.g.,* Restatement (Second) of Trusts § 330 cmt. j (1959); Scott, *The Law of Trusts* § 330.8 (4th ed.1989); Bogert, *Trusts and Trustees* § 1001 (2d ed.1983); 76 Am.Jur.2d *Trusts* § 97 (1992); 90 C.J.S. *Trusts* § 115 (2002).

With this prologue completed, we consider Appellants' assertion that the trial court erred in failing to apply § 474.400 in the case at bar. This statute states:

No will in writing, except in the cases herein mentioned, nor any part thereof, shall be revoked, except by a subsequent will in writing, or by burning, canceling, tearing or obliterating the same, by the testator, or in his presence, and by his consent and direction.

By its express terms, the statute applies only to wills. Appellants have cited no case, and we have found none in our independent research, holding that § 474.400 has any application whatsoever to the revocation of a trust. We also have examined the substantial body of Missouri statutory law concerning trusts and trustees that is codified in Chapter 456 of the revised statutes. After perusing this chapter, which contains over 80 statutes, we find none remotely similar to § 474.400. So far as we have been able to determine, there was no Missouri statute in effect prior to Arnold's death that addressed, in any fashion, the

---

persons besides Arnold had access to the amended trust documents, before and after his death, while the documents were stored in his safe deposit box and at the Care Center; (2) Arnold never expressed any intention of changing the distributions to the Nutrition Center, the Library, or James; (3) Arnold never expressed any intention of allowing his estate to pass by intestacy; and (4) Arnold never expressed any intention to leave any assets to Bill other than lots worth $5,000. Thus, the court's decision is amply supported by the evidence. In view of the disposition that we make of Appellants' points, however, we indulge in the aforementioned assumption in order to address the issues as framed by Appellants.

manner by which trusts in this state may be revoked.[8] Thus, we find no statutory basis for Appellants' argument that revocation of a trust by physical act, such as tearing, is permissible in Missouri.

Appellants acknowledge this to be true, but still suggest the same rule should be applied to trusts. We are constitutionally bound to follow the most recent controlling decision of the Missouri Supreme Court on this issue. See Thomas v. City of Springfield, 88 S.W.3d 155, 160 (Mo.App.2002). In Love, our Supreme Court held that a settlor who reserves a power to revoke the trust only in a particular manner or under particular circumstances can revoke the trust only in that manner and under those circumstances. Love, 497 S.W.2d at 159. The terms of Arnold's amended trust—which were not changed after the trust was executed—only authorized revocation if Arnold gave written notice to that effect to the trustee, and the trustee delivered written instruments transferring trust assets back to Arnold's individual control. The trial court made specific findings of fact in its judgment that these events did not occur. Accordingly, the trial court's ruling, that tearing out the distributive provisions in Arnold's trust was not a permissible method of revoking his trust, was supported by the evidence and did not misapply the law. Appellants' first point is denied.

### Point II

■ In Appellants' second point, they argue the trial court erred in requiring compliance with the specific method of revocation contained in the trust itself because Arnold could, and did, waive the notice requirement by physically destroying the trust. Appellants rely upon St. Louis Union Trust Co. v. Dudley, 162 S.W.2d 290 (Mo.App.1942), to support their argument.

After reviewing Dudley, we find it to be factually distinguishable. There, the settlor reserved the right to withdraw assets from the trust upon giving written notice to the trustees. Dudley, 162 S.W.2d at 292. The two trustees were the settlor and his brother. The trust corpus included two insurance policies, which were kept in a safe deposit box along with other trust assets. After the trust was created, the settlor physically removed the two insurance policies from the trust's box and placed them in a new safe deposit box he and his brother rented for their individual use. The co-trustee brother was aware that the policies had been withdrawn from the trust's box and placed in the individuals' box before the settlor died. Under these circumstances, the eastern district of this court held that the trustees waived the requirement of receiving written notice. Id. at 293. It was the clear and unequivocal removal of the insurance policies from the trust assets, however, which resulted in the partial revocation of the trust.

The case which we deem controlling is not Dudley, but Maple Tree Investments, Inc. v. Port, 821 S.W.2d 562 (Mo.App. 1991). In Maple Tree, the Maple Tree

---

8. This changed in 2004 when the legislature passed House Bill 1511, which completely overhauled Missouri's statutory trust law by adopting the Missouri Uniform Trust Code ("MUTC"). House Bill 1511, which becomes effective on August 28, 2004, provides for the future codification of the MUTC in §§ 456.1–101 through 456.11–1106. For revocable trusts executed after December 31, 2004, the MUTC essentially tracks existing Missouri law on the manner in which a power of revocation is to be exercised. If the terms of the trust provide a method of revocation, a settlor may revoke the trust only by substantially complying with the method specified therein. See § 456.6–602.3(1). If the terms of the trust do not provide a method, any method manifesting clear and convincing evidence of the settlor's intent to revoke the trust may be used. See § 456.6–602.3(2).

Investment company claimed its deed of trust constituted a valid lien on a piece of property previously conveyed by Port to her revocable trust. Maple Tree argued that Port's execution of the deed of trust revoked the trust as to this property and that she and her co-trustee waived the trust's written notice requirement. The western district of this court held that, even if the notice requirement was waived, no partial revocation of the trust occurred because the property was not released from the trust assets and transferred back to Port:

> Laura Port's trust agreement specified a two-step procedure for revocation: (1) notice of revocation to the trustees and (2) the trustees' issuance of "such instruments in writing as may be necessary to release to [Laura Port] and transfer [the property] to her[.]" Because the trustees did not deliver a release or transfer the property, we conclude that the deed of trust did not revoke the trust. When a trust agreement sets forth a particular manner for the trust's revocation, a settlor can revoke the trust only in that manner. *St. Louis Union Trust Company v. Dudley,* 162 S.W.2d 290 (Mo. App.1942). Maple Tree focuses on the notice requirement and asserts that it was satisfied in this case the same way it was satisfied in *Dudley:* The settlor "waived the absurdity of any written notice from himself as donor addressed to himself as trustee" and that the non-settlor trustee waived notice by being aware of the settlor's removal of the res and acquiescing. *Id.* at 294. Even if John Port did waive notice in this manner, Maple Tree does not explain how the second prong of the trust agreement's requirements, the trustees' release or transfer of the property back to Laura Port, was satisfied. A writing conveying the property from the trustees back to Laura Port was necessary to provide a marketable title. A trustee has legal title to a trust's res. *See Simmons v. Friday,* 359 Mo. 812, 224 S.W.2d 90 (1949). Failure to satisfy this requirement is fatal to Maple Tree's theory that the deed of trust revoked the trust.

*Maple Tree,* 821 S.W.2d at 564. Here, the revocation provision in Arnold's trust is virtually identical to the one at issue in *Maple Tree.* Since no assets were released or transferred from Arnold's trust to Arnold individually prior to his death, his trust was not revoked. Therefore, Appellants' notice argument is immaterial. Even if written notice was waived, failure to release or transfer assets from the trust's control prevented revocation from occurring.

Although we do conclude that Appellants' notice argument is half-right, this conclusion requires us to depart from the familiar adage and find that Appellants' glass is not half-full, but empty. The trial court properly decided Arnold's amended trust was not revoked prior to his death because there was no compliance with the specific method of revocation set out in his amended trust. The court's conclusion was supported by the evidence and did not misapply the law. Appellants' second point is denied.

The trial court's judgment does not erroneously declare or apply the law, is supported by substantial evidence, and is not against the weight of the evidence. Accordingly, we affirm.

PARRISH, J., and RAHMEYER, C.J.-P.J., concur.